110 F.3d 898
 75 Fair Empl.Prac.Cas. (BNA) 355,
71 Empl. Prac. Dec. P 44,866,
46 Fed. R. Evid. Serv. 1004
Richard Hall LIGHTFOOT, Plaintiff-Appellant-Cross-Appellee,
v.
UNION CARBIDE CORP., A.W. Lutz, President, Industrial
Chemicals Division, W.E. Shackelford, Vice
President, Industrial Chemicals
Division,
Defendants-Appellees-
Cross-Appellants.
 Nos. 1710, 1881, Dockets 95-9206(L), 95-9258(XAP).
 United States Court of Appeals,Second Circuit.
 Argued June 16, 1997.
Decided March 27, 1997.
 
 Arthur M. Wisehart, New York City (Wisehart & Koch, New York City, of counsel) for Plaintiff-Appellant-Cross-Appellee.
 Joel E. Cohen, New York City (Julie Y. Chen, Nancy I. Solomon, McDermott, Will & Emery, New York City, of counsel) for Defendants-Appellees-Cross-Appellants.
 Before: KEARSE and McLAUGHLIN, Circuit Judges.*
 McLAUGHLIN, Circuit Judge:
 
 
 1
 Plaintiff appeals from an order entered May 12, 1994 in the United States District Court for the Southern District of New York (Patterson, J.) granting summary judgment to defendants, dismissing all but one of plaintiff's claims. Defendants cross-appeal, attacking the verdict as against the weight of the evidence and the entire trial as fundamentally unfair.
 
 BACKGROUND
 
 2
 Plaintiff Richard Lightfoot was hired by defendant Union Carbide in 1959 as a chemical engineer in Carbide's Charleston, West Virginia facility. Over the following thirty-three years Lightfoot advanced fairly steadily in the company, taking on increasingly challenging job responsibilities with corresponding increases in his salary. In 1968 Lightfoot was transferred to Carbide's New York office, where he assumed a product-management position. In 1973 he was promoted to Marketing Manager, and six years later he became Business Manager in Carbide's Glycol Ethers group, within the Industrial Chemicals Division ("ICD"). Lightfoot was eventually asked to manage the Ethylene Amines group, which was also part of the ICD, and his salary grade was subsequently raised from Grade 16 to Grade 17. Defendant W.E. Shackelford, Vice-President of the ICD, promoted Lightfoot to Business Director of the Ethylene Amines group in 1988, but Lightfoot remained at salary Grade 17 even after the promotion.
 
 
 3
 According to defendants, Shackelford and Glen Kraft, another ICD vice-president, became dissatisfied with Lightfoot's work soon after his promotion to Business Director. Shackelford made annual performance appraisals of Lightfoot between 1987 and 1990 that were generally positive, but also discussed areas in which Lightfoot could improve. The 1988 review, for instance, noted several areas where Lightfoot's group was behind schedule; and in the 1989 review Shackelford wrote that "[Lightfoot] needs improvement in the area of conceptualizing, communicating and causing to happen his ideas as to where the business should go ... [;] he also has real opportunity to improve in the area of interpersonal skills."
 
 
 4
 In May 1990 Lightfoot was assigned to the position of Manager of Special Projects for the Ethylene Oxide Derivatives Department ("EOD") within ICD. Five months later he was reassigned as Marketing Manager for the Surfactants group within EOD. Throughout this period Lightfoot's salary was mired at Grade 17.
 
 
 5
 In the early 1990s, Carbide purchased a subsidiary chemical business from Rohm and Haas Chemical Company. In connection with that purchase, Carbide hired several Rohm and Haas employees who were familiar with the products and customers of this new business. Shackelford testified that the ICD's focus subsequently diverted from development of new products to maximizing the potential of the newly acquired product line. According to defendants, this shift in priorities necessitated a corresponding reduction of marketing staff. In a meeting (the "forced-ranking" meeting) with Harry Short, a business director, Robert Cellura, National Sales Manager of the EOD, and Robert Kisker, Business Director of Amines, Shackelford asked all the participants to rate the twelve marketing employees in Lightfoot's business group on a scale of one to five in several performance categories. They then ranked the employees according to their total scores.
 
 
 6
 Lightfoot and another marketing employee, Michael Goebel, received the lowest overall scores. Defendants testified that Lightfoot's poor ranking was principally due to his low scores for "reassignment potential," reflecting Shackelford's previous, unsuccessful attempts to place Lightfoot in various positions outside his group.
 
 
 7
 On April 27, 1992, Lightfoot was notified that he would be terminated as part of a reduction-in-force program. As severance, he received his full pay and benefits until February 1993. At the time of the forced-ranking meeting, Lightfoot was fifty-six years old. Goebel, who was not terminated, was thirty-nine. Defendants testified that Goebel was retained despite his equally low score because his supervisor, Kisker, specifically lobbied on his behalf.
 
 
 8
 Lightfoot filed a discrimination charge with the EEOC on May 14, 1992, and in August 1992 he filed suit in the United States District Court for the Southern District of New York against Carbide, Shackelford and A.W. Lutz, President of the ICD. Lightfoot's complaint asserted claims for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., the New York State Human Rights Law ("NYSHRL"), N.Y.Exec.Law § 290 et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C.Admin.Code § 8-502 (1991). Lightfoot also included a claim of discriminatory termination in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), and state-law claims for breach of an implied contract of permanent employment, recovery in quantum meruit or unjust enrichment of Carbide through products invented by Lightfoot during his employment by Carbide, and a claim of tortious interference with contract against Shackelford individually.
 
 
 9
 In a letter dated December 3, 1992, while this suit was pending, Shackelford informed Lightfoot that another Market Manager had resigned, and he offered Lightfoot "resumption of the Market Manager position [he] held prior to its elimination," on the same terms and conditions as existed at the time of his termination and with no loss of service credit. Lightfoot never responded to the letter, and in February 1993 he accepted a position with CRI, Inc., a consulting firm in the chemical industry.
 
 
 10
 In July 1993 defendants sought summary judgment dismissing Lightfoot's complaint; Lightfoot filed a cross-motion for partial summary judgment on his claims of age discrimination, quantum meruit and unjust enrichment. In an Order and Opinion dated May 12, 1994, Judge Robert P. Patterson Jr. denied Lightfoot's cross-motion and granted defendants partial summary judgment as to all but the ADEA and NYSHRL claims of age discrimination. The court also held that Lightfoot's rejection of Carbide's December 1992 offer of reinstatement barred Lightfoot from recovering back pay or front pay should he prevail in his age discrimination claims. Lightfoot moved for reargument of the summary judgment motions and later asked the court to vacate and amend its order of May 12; the court denied both motions.
 
 
 11
 In February 1995 the case was reassigned to Judge Harold Baer. In a Memorandum Order dated May 31, 1995, Judge Baer ruled that evidence of Lightfoot's participation in the invention of products for Carbide would not be admissible because the quantum meruit and unjust-enrichment claims had already been dismissed. In an oral ruling (never memorialized in writing) before counsel's opening statements at trial, the court further held that Lightfoot's claims for damages arising from Carbide's failure to increase his salary grade in 1988 were time barred because Lightfoot failed to file a claim with the EEOC within 300 days of the alleged discriminatory act. Having determined that Lightfoot was no longer eligible for any remedy available under the ADEA, the court concluded that the ADEA claim must also be dismissed and that plaintiff's "sole remaining claim[ was one for] compensatory damages under the New York State Executive Law."
 
 
 12
 Lightfoot's remaining state-law claim was tried before a jury in June 1995. The court reminded the jury that the only claim before it was the state-law claim and that the only remedy available to Lightfoot was an award of compensatory damages for mental anguish or humiliation suffered as a result of Carbide's discriminatory acts. On June 29, 1995, the jury returned a $750,000 verdict for the plaintiff.
 
 
 13
 The court entered judgment in favor of Lightfoot on July 26, 1995, and on August 5 Lightfoot moved for attorney's fees, expenses, and post-judgment interest pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure and § 626(b) of the ADEA. On August 7 defendants filed a motion for either a complete new trial, a new trial on the issue of damages only, or a remittitur of the damage award. In an Order and Opinion dated October 24, 1995, the district court denied plaintiff's motion for fees and expenses but granted his request for post-judgment interest. The court also denied defendants' motion for a new trial but reduced the damage award to $75,000.
 
 
 14
 Lightfoot subsequently filed a motion seeking disqualification of Judge Baer on grounds of bias and vacatur of the order of October 24 reducing the jury's damage award. The court denied both motions. This appeal followed.
 
 
 15
 Lightfoot now claims on appeal that the district court erred in dismissing his claims (1) for back and front pay; (2) for Carbide's failure to pay him adequate compensation when he was promoted several years before his termination; and (3) for unjust enrichment arising from Lightfoot's assignment of invention patents to Carbide. He also asserts that the district court erroneously denied his claims for attorney's fees and that the court's reduction of damages from $750,000 to $75,000 denied his right to a jury trial.
 
 
 16
 Carbide claims on its cross-appeal that the district court erred in denying its motion for a new trial on the grounds that the verdict was against the weight of evidence and other prejudicial errors at trial.
 
 DISCUSSION
 
 17
 A. District Court's Grant of Partial Summary Judgment
 
 1. State-law claim of unjust enrichment
 
 18
 Lightfoot contends that during his years of employment by Carbide he participated in the development of several "new products and lines" and that he was promised "additional compensation" for these "inventions." In his complaint, he sought recovery of Carbide's profits from these inventions under state-law principles of unjust enrichment.
 
 
 19
 Defendants answer that Lightfoot's claim is precluded by a Memorandum of Employee's Agreement (the "Agreement") in which Lightfoot agreed to assign to Carbide any inventions made in the course of his employment by Carbide. Agreeing with defendants, the district court granted defendants' summary judgment motion dismissing the unjust-enrichment claim. Lightfoot argues on appeal that summary judgment was inappropriate because the terms of the Agreement are ambiguous, and thus there is a genuine issue of material fact.
 
 
 20
 It is true that under the quasi-contractual doctrine of unjust enrichment, courts may infer the existence of an implied contract "to prevent one person who has obtained a benefit from another ... from unjustly enriching himself at the other party's expense." Chadirjian v. Kanian, 123 A.D.2d 596, 506 N.Y.S.2d 880, 882 (1986) (citations omitted). Such an agreement will not be implied, however, "where there is a valid express agreement between the parties which explicitly covers the same specific subject matter for which the implied agreement is sought." Id. Lightfoot concedes that in 1959 he signed the following Agreement:
 
 
 21
 In consideration of my employment by Union Carbide Corporation ... in a capacity which makes available to me confidential information concerning the technology and trade secrets on which the Corporation's business depends, I agree ... [t]o assign to Union Carbide Corporation all inventions made by me, alone or jointly with others, in the course of such employment, relating to the business of the Corporation or resulting from tasks specifically assigned to me by the Corporation.
 
 
 22
 ....
 
 
 23
 This Agreement does not, of course, bind either party to any specific period of employment.
 
 
 24
 Lightfoot signed the identical agreement in 1986.
 
 
 25
 Plaintiff finds these agreements ambiguous. See Seiden Assocs. v. ANC Holdings, 959 F.2d 425, 428 (2d Cir.1992) ("Where language used is susceptible to differing interpretations ... and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become[s] an issue of fact and summary judgment is inappropriate."). Contract terms are considered ambiguous if they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir.1996).
 
 
 26
 Lightfoot's cavil with the Agreements is that they do not contain any provision specifying the effect of an employee's termination on any claims he might later assert. Because contract terms are construed against the drafter, see Monica Textile Corp. v. S.S. Tana, 952 F.2d 636, 643 (2d Cir.1991), he argues, silence in the Agreements should not be interpreted as a waiver of his "post-employment claim of damages for unjust enrichment arising from ... wrongful termination as a result of age discrimination." Appellant's Brief at 44.
 
 
 27
 This argument conflates ambiguity and omission. The plain language of the Agreements is clear: Lightfoot agreed to an unconditional assignment of any and all inventions created by him while working for Carbide. The unconditional assignment is not rendered ambiguous by the parties' failure to anticipate specifically how Lightfoot's employment might end. Thus, while Carbide may indeed have been enriched by Lightfoot's efforts, we cannot say that such enrichment was unjust. There is no genuine issue of material fact on the issue of unjust enrichment, and the court's grant of summary judgment on this issue was appropriate.
 
 2. Claims under ERISA
 
 28
 The district court also granted summary judgment dismissing Lightfoot's claim under ERISA. Section 510 of ERISA provides that "[i]t shall be unlawful for any person to discharge ... a participant or beneficiary [of an employee benefit plan] ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...." 29 U.S.C. § 1140. There is, however, no cause of action under section 510 where the loss of pension benefits "was a mere consequence of, but not a motivating factor behind, a termination of employment." Dister v. Continental Group, Inc., 859 F.2d 1108, 1111 (2d Cir.1988). To defeat summary judgment Lightfoot had to adduce some evidence from which a reasonable jury could conclude that Carbide terminated his employment with the intent to reduce his pension benefits.
 
 
 29
 Although Lightfoot's complaint alleged a "pattern or practice of age discrimination in employment intended to deprive older ... employees of opportunity to optimize the benefits available to them," he has come forward with no specific facts to support this allegation. He argues on appeal that pre-termination discrimination against him "must" have resulted from Carbide's desire to interfere with his pension benefits because it had that effect. This is a textbook illustration of the post hoc ergo propter hoc fallacy. See Dister, 859 F.2d at 1117 n. 1 ("[M]ere cost savings and proximity to benefits are [in]sufficient ... to create a genuine issue of fact requiring a trial"); Humphreys v. Bellaire Corp., 966 F.2d 1037, 1044 (6th Cir.1992) (citing Dister ). Where an employee's ERISA claim is based only on a claim that the employee has been deprived of the opportunity to accrue additional benefits through more years of employment, "a prima facie case requires some additional evidence suggesting that pension interference might have been a motivating factor." Turner v. Schering-Plough Corp., 901 F.2d 335, 348 (3d Cir.1990). Lightfoot has presented no such evidence, and summary judgment was appropriate.
 
 3. Dismissal of pre-termination claims
 
 30
 Lightfoot insists that he should have received a pay raise in 1988 when he was promoted to Business Director. Under the ADEA, a plaintiff in a "deferral state" such as New York must first file an administrative charge with the EEOC within 300 days of the alleged violation in order to preserve his right to bring a lawsuit. See 29 U.S.C. §§ 626(d), 633(b). A claim under the NYSHRL must then be filed within three years of the alleged discriminatory act. See Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 238-40, 448 N.E.2d 86, 92-93 (1983).
 
 
 31
 To maintain his pay-disparity claim, Lightfoot would have had to file a charge with the EEOC within 300 days of his 1988 promotion and also file his complaint in federal court within three years of that promotion. He missed both of these deadlines. The district court thus properly dismissed the claim as time barred under both the ADEA and the NYSHRL.
 
 
 32
 Lightfoot attempts to circumnavigate the EEOC filing deadline by arguing that defendants' failure to pay him at an appropriate salary level should be treated as a continuing violation. We have recognized a continuing-violation exception to both Title VII and ADEA cases. Under the exception, a plaintiff who files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations. See Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir.1993); Cook v. Pan Am. World Airways, 771 F.2d 635, 646 (2d Cir.1985). The continuing-violation exception applies where there is evidence of specific discriminatory practices, such as the repeated use of discriminatory seniority lists or employment tests. See Lambert, 10 F.3d at 53; Association Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 274-75 (2d Cir.1981). Discrete incidents of discrimination that are unrelated to an identifiable policy or practice, on the other hand, "will not ordinarily amount to a continuing violation," unless such incidents are specifically related and are allowed to continue unremedied for "so long as to amount to a discriminatory policy or practice." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir.1996).
 
 
 33
 Lightfoot contends that between 1988 and his termination in 1992 he was repeatedly "demoted," and his pay grade remained frozen. He argues that the denial of a pay-grade increase, the alleged demotions, and his termination were part of an ongoing policy of "victimizing" older employees. Although the mere allegation of the existence of such a policy would be sufficient to withstand a challenge for failure to state a claim, something more is required to avoid summary judgment on the issue. Summary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict. Lightfoot has presented no evidence to support his claim of a discriminatory policy or a connection between his job reassignments and a discriminatory animus.
 
 
 34
 If Lightfoot was entitled to a pay raise because of the added responsibilities of his new position, the entitlement arose at the time of his promotion. "Completed acts such as a termination through discharge or resignation, a job transfer, or discontinuance of a particular job assignment, are not acts of a 'continuing' nature." Malarkey v. Texaco, 559 F.Supp. 117, 121 (S.D.N.Y.1982), aff'd, 704 F.2d 674 (2d Cir.1983) (per curiam) (affirming on grounds of failure to state a claim). Lightfoot's attempt to characterize as a continuing violation Carbide's alleged failure to compensate him adequately is therefore unavailing.
 
 
 35
 Lightfoot next argues that Carbide's failure to offer him adequate compensation should nevertheless be considered a continuing violation because Lightfoot continued to feel the effects of the lower pay up to the time he was terminated and because another manager was later promoted to the business director position at a higher salary. This position is clearly without merit under Malarkey. See 559 F.Supp. at 121. A continuing violation is not established merely because an employee continues to feel the effects of a discriminatory act on the part of the employer. To hold otherwise would render meaningless the time limitations imposed on discrimination actions.
 
 
 36
 4. Back and front pay: the Reinstatement Letter
 
 
 37
 Lightfoot argues that summary judgment was improperly granted because there are genuine issues of fact as to whether Lightfoot acted reasonably in declining Carbide's offer of reinstatement in December 1992.
 
 
 38
 In Ford Motor Co. v. EEOC, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), the Supreme Court held that when an employer makes an unconditional offer to reinstate an employee terminated as a result of discrimination, the employee's rejection of that offer forecloses any claim for future front pay and tolls the continuing accrual of back-pay liability under Title VII of the Civil Rights Act of 1964. Id. at 227, 102 S.Ct. at 3063. Back pay is tolled as of the date of the employee's rejection. Id. The Court based its holding in Ford on the statutory duty of a Title VII complainant to mitigate damages, see 42 U.S.C. § 2000e-5(g), and the statute's underlying legislative purpose to "make the victims of unlawful discrimination whole by restoring them so far as possible ... to a position where they would have been were it not for the unlawful discrimination." Id. at 230, 102 S.Ct. at 3065 (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975)) (internal quotation marks omitted).
 
 
 39
 The NYSHRL substantially tracks Title VII, both in its requirement that plaintiffs mitigate their damages by seeking and accepting alternative employment, see Ryan v. New York State Thruway Auth., 889 F.Supp. 70, 80-81 (N.D.N.Y.1995) (citations omitted), and in the legislative purpose behind the law, see N.Y.Exec.Law § 290(3) (describing purpose of article as, inter alia, "to eliminate and prevent discrimination in employment"). The rationale of Ford 's "unconditional offer" rule thus supports the application of that rule to NYSHRL plaintiffs as well as those seeking relief under Title VII.
 
 
 40
 Lightfoot maintains that he should not have had to accept the offer to resume his old job as Market Manager on the same terms and conditions as existed when he was fired because the salary he had been getting as Market Manager had been affected by Carbide's prior discriminatory actions, and he was entitled to a higher salary. That, however, is not the law. To toll the accrual of back-pay liability, an employer need only offer reinstatement to "a job substantially equivalent to the one he was denied," Ford, 458 U.S. at 232, 102 S.Ct. at 3066, not a job equivalent to the one to which the employee must prove he was entitled if he is to prevail in his suit. In short, an employer is not required to "insure the claimant against the risk that the employer might win at trial." Id.
 
 
 41
 Lightfoot also suggests that Carbide's offer was made in bad faith as part of a "maneuver to put Lightfoot back under the power of defendant Shackelford where he could be subjected to further harassment until a more propitious scenario for his termination could be devised." Appellant's Brief at 35. Although we are required, in reviewing a motion for summary judgment, to view the evidence in the light most favorable to the nonmoving party, and to draw all inferences in favor of that party, see Yerdon v. Henry, 91 F.3d 370, 375 (2d Cir.1996), Lightfoot cannot defeat summary judgment with his wholly unsupported claims that there was an ulterior motive behind the offer, see Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." (quotations and citations omitted)). Lightfoot has failed to set forth anything concrete to support his position that the unconditional offer of employment was a ploy.
 
 
 42
 Lightfoot further contends that his rejection of Carbide's offer was reasonable because (1) he had already agreed to accept a position with a consulting company and (2) the stress of returning to work for Carbide (particularly under Shackelford) would have imperiled his health and well-being.
 
 
 43
 It is a matter of law that a commitment to a new employer does not preserve the employee's right to recover back pay for discriminatory termination from a previous employer. See Ford, 458 U.S. at 234-36, 102 S.Ct. at 3066-68 ("The claimant who [rejects an offer of reinstatement in favor of remaining in a replacement job] does so ... not because [the previous job] provides inadequate compensation, but because the value of the replacement job outweighs the value of the defendant's job supplemented by the prospect of full court-ordered compensation.").
 
 
 44
 As to Lightfoot's second point, although Lightfoot raised the issue of his medical condition in an affidavit attached to his original motion papers, he did not at that time present the district court with a physician's affidavit to support his claim. Instead, Lightfoot later attempted to introduce the affidavit of Dr. Stanley Portnow in a motion to vacate and amend the court's order granting defendants' motion for summary judgment. The district court properly declined to consider Dr. Portnow's affidavit, as it had been in Lightfoot's possession for two years before the court's order and therefore was not "newly discovered evidence" that might have justified reconsideration of the court's decision.
 
 
 45
 Finally, Lightfoot contends that under Rule 408 of the Federal Rules of Evidence the reinstatement letter should not have been considered. Rule 408 bars the admission of statements and conduct made "in the course of compromise negotiations." See Pierce v. F.R. Tripler & Co., 955 F.2d 820, 826-29 (2d Cir.1992) (affirming trial court's exclusion of evidence of reinstatement offer made during settlement negotiations). By definition, an unconditional offer may not require the employee to abandon or modify his suit, and no such request was made by defendants. The offer therefore cannot be considered an offer of settlement or compromise.
 
 
 46
 In sum, because Lightfoot continued to receive his full salary and benefits as severance pay through February 1993, he cannot recover back pay for the period between his termination in April 1992 and his rejection of the offer of reinstatement in December 1992. Because his rejection of Carbide's offer foreclosed his claims to back pay and front pay after December 1992, the district court properly granted Carbide summary judgment on all of Lightfoot's claims for back and front pay.
 
 5. Claims under the ADEA
 
 47
 There is confusion in the record as to whether the district court actually granted defendants summary judgment dismissing Lightfoot's claim under the ADEA, and, if it did not, whether it should have. In his order of May 12, 1994, Judge Patterson denied defendants' motion for summary judgment as to Lightfoot's claims under the ADEA and NYSHRL. In a ruling from the bench immediately before opening statements at the trial, Judge Baer noted that during a conference with counsel on June 20 he had resolved the issue of pre-termination damages against Lightfoot. Judge Baer concluded that in light of his decision denying pre-termination damages and Judge Patterson's earlier dismissal of claims for back and front pay, Lightfoot no longer had a viable claim for compensable damages under the ADEA. In the absence of an available remedy, the court granted defendants summary judgment dismissing Lightfoot's ADEA claim.
 
 
 48
 Lightfoot argues on appeal, however, that the court's dismissal of his claim was without effect because the court failed to enter the order of dismissal in the case docket. Rule 6(a) of the Civil Rules of the Southern District of New York provides in pertinent part:
 
 
 49
 (a) A memorandum signed by the judge of the decision on a motion that does not finally determine all claims for relief shall constitute the order unless the memorandum directs the submission or settlement of an order in more extended form.
 
 
 50
 The notation in the appropriate docket of such memorandum, or of an oral decision which does not direct the submission or settlement of an order in more extended form, shall constitute the entry of the order.
 
 
 51
 Lightfoot argues that because Judge Baer's order dismissing his ADEA claim was not properly entered in the docket pursuant to Rule 6(a), it is a nullity. Lightfoot cites no authority for this argument and we are not inclined to adopt so draconian a rule.
 
 
 52
 Rule 6(a) is a ministerial rule of procedure, intended to ensure that case dockets are properly maintained as useful sources of information for the litigants and court personnel. Where a court's oral order is clearly stated and both parties are present, there is no harm in overlooking the court's failure to comply scrupulously with the rule. On these facts, the harsh application of the rule urged by Lightfoot is required neither by considerations of fairness nor the interest of judicial economy.
 
 
 53
 Lightfoot's final argument is that even if the court was correct in its determination that he lacked a viable claim for damages under the ADEA, his claim should not have been dismissed; rather, the court could have granted equitable relief. The ADEA expressly authorizes courts to grant claimants "such legal or equitable relief as may be appropriate to effectuate the purposes of [the act], including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for [compensatory damages]." 29 U.S.C. § 626(b); see also Whittlesey v. Union Carbide Corp., 742 F.2d 724 (2d Cir.1984) (affirming award of front pay under ADEA).
 
 
 54
 In his complaint Lightfoot sought only money damages and "such other and further relief as to this Court may seem just and proper." While this general, ritualistic prayer for additional relief might have entitled Lightfoot to some form of equitable relief after he had established his claim under the ADEA, see Fed.R.Civ.P. 54(c), this boilerplate language is insufficient to defeat summary judgment where the relief specifically requested by the plaintiff is unavailable as a matter of law. In this case Lightfoot cannot say even now what equitable relief would have been appropriate. His rejection of Carbide's offer indicates that reinstatement was not a viable form of relief. He mentions injunctions in his brief but does not specify what activity ought to have been enjoined. In short, his argument amounts to a claim that so long as some form of relief was conceivable, even if he himself cannot articulate what that relief might be, his claim ought not to have been dismissed. We disagree, and thus conclude that summary judgment was properly granted.
 
 B. Carbide's Motion for a New Trial
 
 55
 1. Verdict against the weight of the evidence
 
 
 56
 Defendants protest that the jury's verdict was contrary to "the great weight of the evidence." The denial of a motion to set aside a verdict as against the weight of the evidence, however, is not subject to appellate review. Stonewall Ins. Co. v. Asbestos Claims Management Corp., 73 F.3d 1178, 1199 (2d Cir.1995), modified, 85 F.3d 49 (2d Cir.1996).
 
 
 57
 The task of reviewing and weighing all of the evidence presented at trial simply imposes too great a burden on the appellate court. Id. Accordingly, while defendants were "entitled to argue to the trial judge that the verdict [was] against the weight of the evidence ... the denial of that challenge is one of those few rulings that is simply unavailable for appellate review." Id. Similarly, defendants may not obtain review of the denial of a new trial on the ground that the jury's damage award was against the weight of the evidence. See Haywood v. Koehler, 78 F.3d 101 (2d Cir.1996) (applying Stonewall to preclude review of denial of a new trial where jury found defendants liable for use of excessive force but awarded no damages).
 
 2. Trial errors
 
 58
 Defendants contend that various evidentiary errors at trial rendered the proceeding fundamentally unfair to them. They point to the following: (1) allowing one of Lightfoot's witnesses, Dr. Cellura, to testify as an expert that age was a factor in Lightfoot's termination, that there was age discrimination at Carbide, and that Carbide took a particular interest in young, talented people; (2) permitting Lightfoot's counsel to question a witness about Carbide's profits and "emissions problems" at Carbide plants in West Virginia and Bhopal; and (3) allowing Lightfoot's counsel to discuss specific dollar figures in his closing argument on damages.
 
 
 59
 A motion for a new trial " 'ordinarily should not [be granted] unless [the trial court] is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " Hygh v. Jacobs, 961 F.2d 359, 365 (2d Cir.1992) (quoting Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 370 (2d Cir.1988)). A trial judge's decision to grant or deny such a motion is reviewed for abuse of discretion. Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir.1992).
 
 
 60
 (a) Testimony of Dr. Cellura
 
 
 61
 Dr. Robert P. Cellura, who was employed by Carbide from 1976 to 1992, testified against Carbide. Cellura participated in the forced-ranking meeting that resulted in Lightfoot's termination. On redirect examination, Lightfoot's counsel asked Cellura whether he believed that any factor other than Lightfoot's performance influenced the decision to terminate Lightfoot. Cellura testified that he believed age discrimination had been involved, pointing to three factors: (1) a decline in the average age of Lightfoot's group and of all of Carbide's business directors after the reorganization; (2) the decision to terminate Lightfoot rather than a similarly ranked younger employee; and (3) a decline in the average age of Carbide's highest-paid employees. Defendants contend that this testimony should have been excluded because it lacked probative value, was not based on Cellura's personal knowledge, and went to the ultimate issue in the case.
 
 
 62
 The Federal Rules of Evidence allow a lay witness to testify in the form of an opinion, provided such testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed.R.Evid. 701. The fact that the lay opinion testimony bears on the ultimate issue in the case does not render the testimony inadmissible. Fed.R.Evid. 704(a); see United States v. Rea, 958 F.2d 1206, 1214-15 (2d Cir.1992) ("Since neither Rule 701 nor Rule 704(a) limits the subject matter of lay opinion testimony, there is no theoretical prohibition against allowing lay witnesses to give their opinions as to [the ultimate issue in the case]."). The admissibility of Cellura's testimony therefore depends upon whether it satisfies the rational-basis and helpfulness requirements of Rule 701.
 
 
 63
 The rational-basis requirement of Rule 701 " 'is the familiar requirement of first-hand knowledge or observation.' " Rea, 958 F.2d at 1215 (quoting Fed.R.Evid. 701 advisory committee's note on 1972 Proposed Rules). When Lightfoot's counsel initially elicited from Cellura his opinion that age was a factor in Lightfoot's termination, the district court sustained defense counsel's objections to the unsupported opinion and told Cellura:
 
 
 64
 You don't have any reason for saying that [age was a factor in Lightfoot's termination]. You have given us a conversation, have you? This isn't gossamer we are working with up here.
 
 
 65
 What do you have that Mr. Shackelford said to support that proposition that he did or that he loved or that he ate or that he smelled?
 
 
 66
 In response to the court's admonition, Cellura described two primary factors upon which he claimed to base his opinion: the declining average age of various categories of Carbide employees and Carbide's retention of young Goebel, who was ranked similarly to Lightfoot in the forced-ranking process. Cellura had previously testified that he was one of five managers working directly under defendant Shackelford and that he was personally involved in the forced-ranking procedure that led to the termination of Lightfoot. Cellura was thus in a position to have acquired personal knowledge of the facts that formed the basis of his opinion. The district court commendably sought to ensure that Cellura's testimony focused on those objective facts.
 
 
 67
 Even when a lay opinion is rationally based upon objective facts, it may still be inadmissible if it does not help the jury to understand the witness' testimony or to decide a fact in issue. Fed.R.Evid. 701(b). This "helpfulness" requirement "is designed to provide 'assurance[ ] against the admission of opinions which would merely tell the jury what result to reach.' " Rea, 958 F.2d at 1215 (quoting Fed.R.Evid. 704 advisory committee's note on 1972 Proposed Rules). The challenged testimony consisted primarily of Cellura's description of the factual basis of his opinion that age was a factor in Lightfoot's termination. Cellura had established a solid foundation of his intimate involvement with Carbide's operation and his opinion was thus based on observations about Carbide's decisionmaking process. This testimony was sufficiently helpful to be admissible.
 
 
 68
 (b) Cross-examination of Shackelford and Kraft
 
 
 69
 Defendants further contend that the trial court erred in allowing Lightfoot's counsel to cross-examine Shackelford about Carbide's earnings between 1989 and 1993, and to question Glen Kraft about emissions problems at Carbide's plants in West Virginia and Bhopal, India. Defendants regard these questions as an attempt to portray Carbide as a disreputable corporate citizen with ample financial resources to compensate victims like Lightfoot. They add that the trial judge's participation in the Bhopal questions amounted to tacit approval of that line of questioning.
 
 
 70
 As to the questions about Carbide's income and financial status, defendants never objected to this testimony. Having failed to make a timely objection at trial, defendants are limited to "plain error" review of the issue. See Fed.R.Evid. 103(a)(1); Berner v. British Commonwealth Pac. Airlines, 346 F.2d 532, 542 (2d Cir.1965) ("[C]hallenge [to defendants' closing argument], raised for the first time on the motion for new trial, came too late.").
 
 
 71
 There was no error here, plain or otherwise, since Carbide's opening statement brought up Bhopal and made an issue of Carbide's financial straits:
 
 
 72
 Union Carbide beginning in the mid-1980's was a company that was having serious financial problems. I'm sure most of you know about Bhopal, which cost the company a lot of money. There was a takeover attempt that cost the company a lot of money, and Union Carbide generally had to start reevaluating its business that resulted in the company selling off a lot of businesses that they owned; it resulted in a lot of cost cutting and it resulted in a lot of reductions in force to a lot of people.
 
 
 73
 The cross-examination of Shackelford simply explored the basis for that opening statement. During plaintiff's cross-examination of defendants' witness, Glen Kraft, the Bhopal tragedy was raised and questions were asked about poisonous emissions and their cause. The court interjected with three or four questions before concluding that the entire subject matter was "totally irrelevant in my view, but since I was interested, I asked those questions."
 
 
 74
 The court's comment that the questions were irrelevant was sufficient to alert the jury that it should not take that information into account in deciding the case. There is no error.
 
 
 75
 (c) Plaintiff's closing argument
 
 
 76
 Plaintiff's counsel, in summation, asked for a specific dollar amount as damages. Defendants now urge us to adopt a per se rule prohibiting counsel from suggesting a specific sum as damages. We decline to do so.
 
 
 77
 While at least one circuit has such a rule, see Waldorf v. Shuta, 896 F.2d 723, 744 (3d Cir.1990) ("[P]laintiff's counsel may [not] request a specific dollar amount for pain and suffering in his closing remarks."), we favor a more flexible approach. It is best left to the discretion of the trial judge, who may either prohibit counsel from mentioning specific figures or impose reasonable limitations, including cautionary jury instructions. See Consorti v. Armstrong World Indus., Inc., 72 F.3d 1003, 1016 (2d Cir.1995) (encouraging trial judges to prohibit counsel from suggesting specific monetary awards for pain and suffering), vacated on other grounds, --- U.S. ----, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996); Mileski v. Long Island R.R. Co., 499 F.2d 1169, 1174 (2d Cir.1974). Here, counsel reviewed the evidence on damages and asked for an award of $1,500,000. The court instructed the jury that damages should be awarded "only upon and only in proportion to a showing as to the nature, duration and severity of his condition."
 
 
 78
 Although the jury's award of $750,000, exactly half of the demand by plaintiff's counsel, suggests that the jurors may have been influenced by counsel's mention of a particular dollar amount, in context, the closing and the charge to the jury do not support defendants' claim that the jury was unfairly influenced. Cf. Consorti, 72 F.3d at 1016 (concluding that plaintiff's counsel's suggestion of a specific amount of damages did not unfairly influence jury that awarded precise amount suggested).
 
 
 79
 (d) The mixed-motive jury instruction
 
 
 80
 Finally, defendants challenge the court's inclusion of a "mixed-motive" instruction to the jury. Age discrimination suits under the NYSHRL get the same analysis as claims under Title VII or the ADEA. See Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (2d Cir.1992). Under Title VII, a plaintiff is entitled to a mixed-motive instruction, which shifts to the defendant the burden of showing that the plaintiff would have been fired even if there were no discriminatory motivating factor, see Price Waterhouse v. Hopkins, 490 U.S. 228, 260, 109 S.Ct. 1775, 1795-96, 104 L.Ed.2d 268 (1989) (White, J., concurring in the judgment), when the evidence "is sufficient to allow a trier to find both forbidden and permissible motives." Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 181 (2d Cir.1992).
 
 
 81
 In Ostrowski we recognized that a plaintiff may carry his burden of proving that a forbidden factor was a motive in his termination through either direct or circumstantial evidence, see id. at 181-82; but a mixed-motive instruction is not required unless such evidence includes "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." Id. at 182 ("[P]urely statistical evidence would not warrant [a mixed motive charge]; nor would ... 'stray' remarks in the workplace by persons who are not involved in the pertinent decisionmaking process.").
 
 
 82
 The district court properly found that Lightfoot produced sufficient evidence to earn a mixed-motive instruction. Lightfoot testified, for example, that Shackelford expressed surprise and disbelief when Lightfoot said he wanted to work until he was seventy years old. In addition to his opinion that age was a factor in Lightfoot's termination, Dr. Cellura testified that Carbide "has a high potential category where they take particular interest in young talented people." While the quantum of Lightfoot's evidence may have been less than that in Ostrowski, it was nevertheless adequate to support the instruction given by the court.
 
 C. Attorney's Fees
 
 83
 While Lightfoot's only claim that survived summary judgment and went to trial was a state claim under the NYSHRL, Lightfoot asserts that he is entitled to an award of attorney's fees as a prevailing plaintiff under the ADEA. The elements of an age discrimination claim are essentially the same under the ADEA and the NYSHRL, although the relief available under the two statutes is not identical. A prevailing party in an action brought under the ADEA is entitled to recover attorney's fees, see Hagelthorn v. Kennecott Corp., 710 F.2d 76, 86 (2d Cir.1983), but the NYSHRL does not provide for an award of fees, see New York City Bd. of Educ. v. Sears, 83 A.D.2d 959, 443 N.Y.S.2d 23, 25 (1981).
 
 
 84
 Lightfoot first argues that the ADEA claim was either never actually dismissed or was improperly dismissed. As discussed above, see supra Part A.5., this argument is without merit.
 
 
 85
 Lightfoot next contends that even if his ADEA claim was properly dismissed, he is entitled to attorney's fees under Dominic v. Consolidated Edison Co., 652 F.Supp. 815 (S.D.N.Y.1986), aff'd, 822 F.2d 1249 (2d Cir.1987) and Milwe v. Cavuoto, 653 F.2d 80 (2d Cir.1981). Dominic is clearly inapposite. Defendants in that case contested the size of the fee award requested by plaintiff's counsel after plaintiff actually prevailed in an action under the ADEA. Defendants argued that plaintiff was not entitled to recover fees for all of the time spent on the case because he had prevailed on only one of five claims originally included in his complaint. The court held that because all five claims alleged age discrimination, and the legal theories involved in all five were "inextricably intertwined," no reduction in the fee award was required. Lightfoot maintains that his claims under the ADEA and NYSHRL were similarly "intertwined," and that he is therefore entitled to recover fees for both claims under Dominic. We disagree. Dominic addresses not whether a plaintiff is entitled to attorney's fees, but how much he may recover once he has established that he is entitled to recover them.
 
 
 86
 Lightfoot's invocation of Milwe is similarly misplaced. In Milwe the plaintiff sued various law-enforcement officials under 42 U.S.C. § 1983 and state tort law. Her complaint alleged that one officer had knocked her to the ground and broken her nose while the others watched, and that several others had violated her constitutional rights by filing a false affidavit to procure her arrest several days after the original incident. A jury found one officer liable for the assault under both § 1983 and state tort law and awarded damages of $1 and $1,320 respectively on those claims. The jury also found for plaintiff on her remaining constitutional claim and state-law claim for false arrest. The district court denied plaintiff's motion for attorney's fees, and the plaintiff appealed.
 
 
 87
 On appeal the defendants in Milwe argued that a fee award would be inappropriate because the jury had awarded substantial damages only on the pendent state-law assault claim, and not on the constitutional claim arising from the same incident. We rejected this argument, holding that "attorney's fees are available in cases in which the plaintiff prevails on a wholly statutory, non-civil rights claim pendent to a substantial constitutional claim." Milwe, 653 F.2d at 84. The Milwe panel reasoned that such a fee award "furthers the Congressional goal of encouraging suits to vindicate constitutional rights without undermining the longstanding judicial policy of avoiding unnecessary constitutional decisions." Id. (quotations omitted). Lightfoot contends that Milwe established a "substantiality test" under which a plaintiff is entitled to attorney's fees when he prevails on a state-law claim arising out of a common nucleus of operative fact with a federal claim pursuant to which attorney's fees would be available. We decline to adopt so broad an interpretation of Milwe.
 
 
 88
 The holding in Milwe was expressly limited to plaintiffs who prevail on a statutory claim pendent to a substantial constitutional claim. Lightfoot's claim under the ADEA was properly dismissed prior to trial, and his action under the NYSHRL was therefore no longer pendent to anything federal when he prevailed at trial. In addition, the underlying rationale of Milwe was based largely on the policy concern of avoiding unnecessary constitutional decisions--a policy not implicated where the asserted basis for a fee award is merely a federal statute such as the ADEA. Finally, we see no reason to reward those plaintiffs who supplement their valid claims under the NYSHRL with meritless claims under the ADEA by allowing them to circumvent the state-law rule that attorney's fees are not available under the NYSHRL. Lightfoot is thus not entitled to an award of attorney's fees as a prevailing plaintiff on this basis.
 
 D. Remittitur of the Damages Award
 
 89
 After a full trial on liability and damages, the jury returned a verdict for Lightfoot and awarded him $750,000 in compensatory damages under the NYSHRL. Defendants moved for a remittitur of the damages award, or, in the alternative, a partial new trial on damages. The district court granted defendants' motion for remittitur, outrightly reducing the jury's award to $75,000. Lightfoot argues that because determination of an award of damages lies within the province of the jury, a court's outright reduction of a jury's award without offering the plaintiff the option of a new trial on damages denies the plaintiff his constitutional right to a jury trial. Plaintiff is right.
 
 
 90
 Where a jury has awarded damages in an amount considered excessive by the trial court, "[i]t is not among the powers of the ... court ... simply to reduce the damages without offering the prevailing party the option of a new trial." Tingley Sys., Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir.1995) (reviewing court's grant of remittitur of damages awarded under Connecticut Unfair Trade Practices Act); Phelan v. Local 305 of the United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus., 973 F.2d 1050, 1064 (2d Cir.1992). This rule derives from the trial-by-jury protections of the Seventh Amendment. Cf. Kennon v. Gilmer, 131 U.S. 22, 29, 9 S.Ct. 696, 698-99, 33 L.Ed. 110 (1889). A trial court may, however, condition denial of a defendant's motion for a new trial on the plaintiff's stipulation to a remittitur in a stated amount. See Tingley, 49 F.3d at 96, 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2815 (1995).
 
 
 91
 Accordingly, the district court erred in granting defendants' motion for a remittitur without offering Lightfoot the option of a new trial on damages. We must remand to allow Lightfoot the opportunity to exercise this option. The Supreme Court's recent decision in Gasperini v. Center for Humanities, 518 U.S. 415, ----, 116 S.Ct. 2211, 2218, 135 L.Ed.2d 659 (1996) sets forth the applicable standards to determine excessiveness and the appropriateness of remittitur under New York law.
 
 CONCLUSION
 
 92
 This matter is remanded to the district court for reconsideration of the court's grant of a remittitur of damages. We have considered all of the remaining claims raised by plaintiff and defendants and, finding them to be without merit, we affirm in other respects the judgment of the district court.
 
 
 
 *
 The Honorable J. Daniel Mahoney, who was a member of the panel, died on October 23, 1996; the appeal is being decided by the remaining two members of the panel, who are in agreement. See 2d Cir.R. 0.14(b)