**4KIDS ENTERTAINMENT, INC.,**
**and 4Kids Productions, Inc.,**
**Plaintiffs,**

v.

**THE UPPER DECK COMPANY, and**
**Upper Deck Entertainment, LLC,**
**Defendants.**

**No. 10 Civ. 3386(CM).**

United States District Court,
S.D. New York.

March 31, 2011.

Evan Stone Rothfarb, Rothfarb Law, PLLC, New York, NY, for Plaintiffs.

Barry L. Cohen, Sorinroyercooper LLC, King of Prussia, PA, Renee F. Bergmann, Thorp Reed & Armstrong, LLP, Philadelphia, PA, for Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge:

This action was filed by 4Kids Entertainment, Inc. and 4Kids Productions, Inc. (collectively "4Kids" or "Plaintiffs"). Plaintiffs sue The Upper Deck Company and Upper Deck Entertainment, LLC (collectively "Upper Deck" or "Defendants") alleging breaches of three separate contracts—the Huntik Term Sheet, the Huntik Commercial Production Agreement ("Huntik Production Agreement"), and the Dinosaur King Commercial Production Agreement ("Dinosaur King Production Agreement") (collectively the "Contracts"). They also assert largely duplicative claims sounding in quantum meruit, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and account stated relating to each of the Contracts.

Upper Deck counterclaims, alleging that Plaintiffs themselves breached the Huntik Term Sheet.

Plaintiffs originally moved for summary judgment on their claims for breach of contract, quantum meruit, unjust enrichment, and account stated as to each contract, as well as for judgment dismissing Defendants' counterclaim.

■ The 4Kids enterprises have recently advised the Court that they have filed in Chapter 11. As a result, Defendants' counterclaim against them is subject to the automatic stay, and plaintiffs' motion to dismiss the counterclaim cannot be adjudicated. Therefore, that aspect of the motion is deemed administratively closed, without prejudice (I do not intend to keep it open on this Court's list of pending motions).

The automatic stay does not extend to claims brought by the debtors against other parties. *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 516 (2d Cir. 1998). Therefore, the Court can and will adjudicate Plaintiffs' motion insofar as it is directed to their own claims.

For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

On a motion for summary judgment, the Court may search the record and grant summary judgment to either party whose claim has been proved or disproved. *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 114–15 (2d Cir.1999) (quoting *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir.1996)). Although Defendants did not move for summary judgment, they are entitled to summary judgment dismissing all of Plaintiffs' claims insofar as they relate to the Huntik Production Agreement, because on the undisputed facts, Defendants have fully complied with their obligations under that contract. Defendants are also entitled to dismissal of Plaintiffs' quasi-contract claim relating to the Huntik Term Sheet.

The Court *sua sponte* dismisses Plaintiffs' claims for quantum meruit, unjust enrichment, and account stated relating to the Dinosaur King Production Agreement because those claims merely duplicate the breach of contract claim relating to that contract. Similarly, all three of Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing are dismissed *sua sponte* because New York does not recognize a separate claim for breach of an implied covenant of good faith where a contract exists. Either the contract's terms were breached or they were not, and "good faith and fair dealing" does not imply any obligation above and beyond the terms of the parties' actual agreement.[1]

---

1. There is only one motion—Plaintiffs' motion—pending on the Court's list of open motions. In a letter dated December 16, 2010, counsel for Defendants refers to a Defendants' motion for summary judgment, but no such

### THE HUNTIK TERM SHEET

## I. Background and Facts

### A. Contract Terms

In early 2008, Upper Deck and 4Kids entered into a two-year licensing and broadcasting agreement for the Huntik Series, an animated children's television series. The Huntik Term Sheet ("Term Sheet") was executed on February 26, 2008 by representatives of Upper Deck and on March 4, 2008, by representatives of 4Kids. (Newborn Decl. Ex. 1, ¶ 11.)

Pursuant to the Term Sheet, Upper Deck agreed to license the rights to the Huntik Series to 4Kids for broadcasting within the United States and its territories. *Id.* at ¶¶ 1–5. The agreement required 4Kids to broadcast twenty-six episodes of Huntik ("Initial Episodes") on the CW Network, *id.* at ¶¶ 5–6, with an exclusive option to license the TV Rights to any additional episodes during the contract period. *Id.* at ¶ 9(a). Each time 4Kids exercised this option, the contract term was automatically extended by one year. *Id.* at ¶ 9(b).

The Term Sheet specified how to format the episodes for broadcast and required Upper Deck to certify compliance with applicable federal broadcasting rules. *Id.* at ¶¶ 13–14.

4Kids received the exclusive right to exploit the broadcast rights, "including, but not limited to terrestrial free TV, internet, video streaming, cellphone, wireless distribution, DSL, WIMAX, video on demand . . . ." *Id.* at ¶ 7(a). Additionally, 4Kids was granted the non-exclusive right to create a website promoting Huntik subject to Upper Deck's consent. *Id.* at

¶ 7(b). In consideration, Upper Deck received $3,846.16 per Initial Episode, up to a maximum of $100,000 if 4Kids executed its option to license additional episodes.[2] *Id.* at ¶ 8.

As long as the Initial Episodes were regularly scheduled for broadcast beginning January 2009, then Upper Deck became obligated to pay 4Kids additional revenue. *Id.* at ¶ 10. The Merchandise Participation provision required Upper Deck to pay 4Kids 12% of the Gross Merchandise Revenue for the term of the contract plus the first six months after the last episode aired. Gross Merchandise Revenue is defined as "all revenue including toys and video games *but excluding trading cards,* less returns and up to 4% in chargebacks, bad debt and credits given to customers." *Id.* at ¶ 10(d) (emphasis added). After six months, the Merchandise Participation was reduced to 6%, then further reduced to 3%, and ultimately 0% twenty-four months after the final broadcast. *Id.* at ¶ 10(a).

Upper Deck was obligated to pay separate royalties on the sale of Huntik trading cards. 4Kids was entitled to 3.5% of the gross revenue on the initial $2,500,000 and 4% on revenue above $2,5000,000 (sic) during the contract term and for a period of six months after the final broadcast date. After the six-month mark, 4Kids was entitled to 2% of the gross revenues; then 1% at the twelve-month anniversary, and 0% after twenty-four months. *Id.* at ¶ 10(b). Upper Deck was further obligated to pay 4Kids "an advance against the Trading Card Royalty in the amount of $350,000 (the "Advance")." *Id.* at ¶ 10(c). The Advance was to be "payable pursuant to the

---

motion appears on the docket sheet. We are unable to contact counsel—the telephone number listed on the docket sheet is a non-working number—and so assume that the letter is in error and that no cross-motion for summary judgment was filed by Defendants.

**2.** Plaintiffs licensed broadcast a total of thirty-nine episodes in 2009, for which Upper Deck would have been entitled to $150,000.24 had the $100,000 cap not been imposed.

Payment Schedule, and fully recoupable against the Trading Card Royalty." *Id.* The Payment Schedule called for a first installment of $175,000 to be paid on or before December 19, 2008, with a second installment due on or before December 18, 2009. *Id.* at Schedule B.

Finally, Upper Deck agreed to pay 4Kids 25% of gross TV Revenues, defined as "all revenues . . . including, without limitation, license fees, advances, royalties, running royalties, and minimum guarantees from the exploitation in the Territory of the TV Rights to the Series." *Id.* at ¶ 11. The Term Sheet provided that 4Kids was responsible for collecting the payments and remitting the total amount to Upper Deck, less up to 7% in actual distribution and marketing expenses incurred by 4Kids. *Id.* at ¶ 11.

As part of the agreement, Upper Deck also entered into a media commitment with 4Kids on the 4Kids TV website and/or 4Kids' Controlled Broadcast in the amount of $300,000. *Id.* at ¶ 12. The Media Commitment became effective at the time the Initial Episodes were scheduled for broadcast. *Id.*

4Kids was required to deliver quarterly reports setting forth the Gross TV Revenues received from exploitation of the TV Rights accompanied by a check for any amount due Licensor. *Id.* at ¶ 15(a). During the contract period and for two years thereafter, Upper Deck had the right to inspect, audit and make copies of 4Kids books and records relating to the Huntik Series. Upper Deck had to pay the cost of the audit unless the audit revealed an underpayment of more than 5% of the amount due. *Id.* at ¶ 15(b).

The Term Sheet included mutual indemnification provisions. The relevant Upper Deck indemnification provision reads:

> [Upper Deck] shall indemnify and hold harmless 4Kids, its affiliates and licensees, and their respective directors, officers, and employees and agents from and against any and all claims, damages, liabilities, costs and expenses, including reasonable outside attorneys' fees, arising from any breach by [Upper Deck] of any of its representations, warranties, duties and/or obligations.

*Id.* at ¶ 16(b). 4Kids agreed to indemnify Upper Deck pursuant to the same conditions. *Id.*

The parties agreed that the "Agreement shall be construed and controlled by the laws of the State of New York." *Id.* at ¶ 17(c).

Of critical importance to this motion: The parties specifically agreed to be bound by the Term Sheet until such time as a long form agreement could be executed. The relevant provision reads:

> The parties agree to execute a long form agreement on or before April 15, 2008, containing the terms set forth herein in more detail as well as such terms as may be agreed to in writing by the parties after good faith negotiation and that are customary to agreements of this kind (including representations, warranties and indemnities by Licensor and 4Kids). *Until such time as such long form agreement is executed, this Deal Memo shall serve as the binding agreement of the parties.*

*Id.* at ¶ 11 (emphasis added). The parties never executed a long form agreement. (Bernstein Decl. ¶ 10.)

**B. Implementation of the Contract**

On October 2, 2008, 4Kids sent Upper Deck invoice P100456 in the amount of $200,000 ($300,000 for payment of the media commitment less $100,000 credit for the license fee due 4Kids). *Id.* at Ex. 4. A second invoice LCR017395 was issued October 10, 2008 in the amount of $175,000 for payment of the Trading Card Advance pursuant to paragraph 10(c) of the Term

Sheet. *Id.* at Ex. 3. 4Kids received a wire transfer in the amount of $375,000 from Upper Deck on December 23, 2008, in payment of the two above described invoices. *Id.* at Ex. 5.

4Kids began broadcasting the Huntik Series in January 2009. (Newborn Decl. Ex. 2.) By December 26, 2009, 4Kids had broadcast thirty-nine episodes of the Huntik Series, including the broadcast of all the Initial Episodes. *Id.* Since 4Kids was only obligated to show 26 episodes per the original Term Sheet, I infer that plaintiffs invoked their option to license 13 additional episodes; this had the effect of automatically extending the contract term by one year, making its termination date February 26, 2011.

On July 30, 2009, 4Kids issued invoice L108199 in the amount of $175,000 for the second installment payment of the Advance, which was payable on or before December 18, 2009. *Id.* at Ex. 6. This invoice has not been paid.

During 2009, Defendants allege they never received payments for TV Revenues they were entitled to pursuant to the accounting provision. Nor did they receive the required quarterly reports from 4Kids. (Defs.' Answer & Countercl., Docket 9.) 4Kids does not deny failing to prepare and file quarterly reports; rather, it contends that it never received any gross TV Revenues, so there was nothing for it to report.

## II. Discussion

Viewing the record in the light most favorable to the non-moving party, a court may find summary judgment where there is "no genuine issue as to any material fact," and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). Sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is warranted when the non-movant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.,* 947 F.2d 1021, 1022 (2d Cir.1991).

### A. Plaintiffs' Claim for Breach of Contract (Huntik Term Sheet)

Plaintiffs' Motion for Summary Judgment on Count I for Breach of Contract (Huntik Term Sheet) is granted in part (as to liability) and denied in part (as to damages).

The Term Sheet required Defendants to pay Plaintiffs an advance of $300,000 in two installments. Defendants made the first payment, but when the second came due on December 18, 2009, they failed to pay the invoice. Plaintiffs seek summary judgment in their favor for the amount

invoiced—$175,000—on the theory of breach of contract.

■ New York law requires a party claiming breach of contract to prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000) (quoting *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998)).

4Kids has performed its obligations under the Term Sheet. It broadcast the Initial Episodes on thirty-nine dates during 2009. (Newborn Decl. ¶ 24; Ex. 2.) 4Kids offered evidence that the second half of the Advance was never paid; Defendants fail to controvert that evidence. It would thus seem that summary judgment for Plaintiffs is in order.

Defendants argues that the Term Sheet does not incorporate the parties complete understanding and, as to the Advance, is ambiguous, because the parties intended that the advance under the Huntik Term Sheet was intended to be a loan to be applied against royalties, not a guaranteed payment. The evidence offered in support of this argument qualifies as parol evidence, so the first order of business is to decide whether the Court can consider it.

■ Where any part of the parties' agreement has been reduced to writing, the parol evidence rule applies. *Laskey v. Rubel Corp.*, 303 N.Y. 69, 71, 100 N.E.2d 140 (1951). If the writing is incomplete, "parol evidence may be admitted, 'not to contradict or vary, but to complete, the entire agreement, of which the writing was only a part.' " *Id.* at 71–72, 100 N.E.2d 140 (quoting *Thomas v. Scutt*, 127 N.Y. 133, 138, 27 N.E. 961 (1891)).

■ The first step in assessing whether the parol evidence rule applies is determining whether the agreement is integrated. *Investors Ins. Co. v. Dorinco Reins. Co.*, 917 F.2d 100, 103–05 (2d Cir. 1990). An agreement is integrated if it "represents the entire understanding of the parties to the transaction." *Id.* at 104. The absence of a merger clause does not conclusively demonstrate that an agreement is not integrated. *See Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F.Supp.2d 450, 454 (S.D.N.Y. 2000). In such cases, the court must "read[ ] the writing in light of the surrounding circumstances" to determine whether the parties intended the agreement to be an integrated contract. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 627 (2d Cir.1995). Under New York law, "a contract which appears complete on its face is an integrated agreement as a matter of law." *Battery Steamship Corp. v. Refineria Panama, S.A.*, 513 F.2d 735, 738 n. 3 (2d Cir.1975) (citing *Higgs v. De Maziroff*, 263 N.Y. 473, 478, 189 N.E. 555 (1934)). "[E]vidence of a very high order is required to overcome the heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties." *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc.*, 46 N.Y.2d 211, 212–13, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978).

■ If the document is integrated, the court must next determine whether the language of the agreement is clear or ambiguous. *Investors Ins.*, 917 F.2d at 104. "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). Ambiguity is found when the contract language suggests "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the

particular trade or business." *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir.1998) (quoting *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997)). Ambiguity can arise either from the language itself or from inferences that can be drawn from the language. *Id.* Therefore, "only where the language *and* the inferences to be drawn from it are unambiguous" may a district court "construe a contract as a matter of law and grant summary judgment accordingly." *Id.* (quoting *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990)).

■ The language and terms of the Term Sheet demonstrate that the agreement is fully integrated. The Term Sheet reflects a licensing agreement between two sophisticated entertainment companies that engaged in extensive negotiation before memorializing their agreement in writing. While the Term Sheet provides for the execution of a long form agreement at some unspecified point in the future, that does not render the Term Sheet a non-integrated contract.

Upper Deck's suggestion that the Term Sheet is simply an "outline" of the relationship between Upper Deck and 4Kids is belied by the detailed and comprehensive nature of the Term Sheet. The Term Sheet sets forth every material contract term: the number of episodes to be broadcast, the format of the episodes, options for acquiring more episodes (which, if exercised, automatically extends the term of the contract), and a number of sophisticated compensation arrangements, including a merchandise participation provision, media commitment, the allotment of royalties based on TV Revenues and Trading Cards, as well as the Advance Provision. Each compensation provision includes compensation reduction provisions that detail the time frame and percentage of the reduction in compensation. The Term Sheet contains warranties and representations about various matters, including federal regulatory compliance. It contains all the provisions one regularly finds in business contracts, including auditing and accounting details, choice of law and indemnifications. Finally, it concludes with an express statement that the parties agree to be bound by the Term Sheet until said time as a long form agreement may be signed. All this supports the conclusion that the agreement represents the full understanding of the parties as of the time it was made.

The fact that the Term Sheet contemplates the possibility of a longer and more detailed agreement, "containing the terms set forth herein in more detail *as well as such terms as may be agreed to* in writing by the parties after good faith negotiation ..." (Newborn Decl. Ex. 1 ¶ 11) (emphasis added), does not call this conclusion into question. The quoted language demonstrates that the parties expected to continue their negotiations and might add terms to the arrangement that is described in the Term Sheet, but does not suggest either a lack of agreement on the contract's essential terms or any inclination to alter them. Indeed, the language quoted makes it clear that any terms already agreed to would remain the same in any longer agreement that the parties might reach. And "might" is the operative word: The quoted language does not impose on the parties to the Term Sheet any obligation to supplement the terms upon which they were already in agreement; so the fact that they never concluded a longer form of agreement, or agreed to any additional terms, does not affect the integrated nature of the terms on which they were already agreed. The very fact that the parties agreed to be bound by the agreements already reached compels the conclusion that there exists an integrated con-

tract to the extent of what is memorialized in the Term Sheet.

The question thus becomes whether the language of the relevant portion of the Term Sheet—the provision that provides for payment of a $375,000 Advance against royalties in two installments—is ambiguous. The agreement cannot be varied by parol evidence, so unless the language requires explanation, parol evidence is unnecessary.

■ An Advance is "the furnishing of money or goods before any consideration is received in return." *Black's Law Dictionary* (9th ed. 2009). In this case, the payment is specifically identified as an advance against royalties that the parties expected would be earned from the sale of trading cards. When a party to a contract agrees to advance funds in the expectation of payment at a later date, it represents the two sides' agreement as to which one of them will bear the financial risk during the period while the royalties are being earned.

■ In this case, the parties agreed that Defendants would bear the risk, because Defendants agreed to advance monies to 4Kids against the expectation that it would recoup those monies in the form of royalties. That much is clear and unambiguous—as are the dates when the advances were to be paid. It is unquestionably the case that Defendants failed to make timely payment of the second advance. Parol evidence is not needed to explain any of this.

■ Furthermore, nothing in the contract suggests that Defendants' failure to pay any specific amount of royalties prior to the due date for the second payment would excuse the making of that payment. The obligation to make the advance payment at a particular time and in a particular amount is contingent on nothing at all.

Therefore, Plaintiffs are entitled to summary judgment on the issue of liability. Defendants unquestionably breached the Term Sheet by failing to pay the second installment of the advance on the date it was due, and they are entitled at the very least to damages representing the time value of that $175,000 if it had been advanced as per the contract.

But this Court is going to order Defendants to write Plaintiffs a check for $175,000, plus interest from December 18, 2009. Plaintiffs are not entitled to summary judgment on the issue of damages because there is indeed an ambiguity in the Term Sheet—just not one that relates to whether Defendants should have paid the second installment of the Advance.

■ Royalties on the trading cards were to have been paid "during the Term in the Territory and for a period of six months from the Last Broadcast Date." (Newborn Decl. Ex. 1, ¶ 10(b).) The "Last Broadcast Date" was December 26, 2009; six months after that was June 26, 2010. The Term was initially two years (expiring on or about February 25, 2010) and appears to have been extended for an additional year (until on or about February 25, 2011), since 4Kids broadcast an additional thirteen episodes. Since the Last Broadcast Date was some eight months before the end of the Term (on February 25, 2011), 4Kids was to pay royalties to Defendants through the end of the Term—which expired some three months ago.

A payment recoupable against royalties appears to be the quintessential example of a true advance. But unfortunately, the Term Sheet (unlike prior contracts between the parties) is silent about whether any portion of the Advance that was not recouped via the payment of royalties was to be returned to the Defendants. One might say that such a result is inherent in the very concept of an "advance," but that

is not always the case. Advances are treated in various ways depending on the parties and the situation. Indeed, it appears, from parol evidence submitted by Defendants concerning the parties' course of dealing, that in prior trading card license agreements between 4Kids and Upper Deck the advance was explicitly tied to a guaranteed minimum royalty, and it was spelled out that the advance would not be repaid to Upper Deck if sales did not reach the specified minimums. (*See* Bernstein Decl. Exs. D and E.) Here, the Term Sheet does not contain analogous language, or specify, one way or the other what was to happen to any unrecouped portion of the advance upon the expiration of the contract's Term (which date is set in the Term Sheet).

For that reason, Plaintiffs are not entitled to summary judgment on the issue of damages. There is no reason for this Court to presume that the Advance was intended by the parties to be some sort of guaranteed minimum payment, to be retained by Plaintiffs in the event the trading cards did not generate enough in the way of royalties to repay the Advance in its entirety. However, there is also no reason for the Court to presume that the Advance was to revert to Upper Deck if it was not entirely recouped via royalty payments. This may be a function of industry custom, or the parties' course of dealing (which actually suggests that advances are to be treated as minimum payments).

Therefore, Plaintiffs have not yet established that they are entitled to anything other than interest on the sum of $175,000 for the period when that sum should have been in their bank account. Put otherwise, while Defendants are indisputably liable for failing to pay the second installment of the Advance when it was due per the Term Sheet, I cannot at this moment determine to what damages Plaintiffs might be entitled, because of an ambiguity

in the contract-not about Defendants' obligation to advance the money in the first place, but about what was to happen with the money advanced after the Term expired, if (as appears to be the case) trading card sales were less than expected.

So Plaintiffs' Motion for Summary Judgment on the theory of breach of contract is granted to the extent of declaring that the contract for payment of the second installment of the Advance was breached on or about December 18, 2009; but is denied to the extent that it seeks to compel payment of the $175,000 at this time. Damages for the breach remain to be calculated.

### B. Plaintiffs' Other Claims Relating to the Huntik Term Sheet are Dismissed

Plaintiffs assert a number of other claims relating to Defendants' failure to pay the second installment of the Advance.

Plaintiffs' Motion for Summary Judgment on the theories of quasi contract (quantum meruit and unjust enrichment) is denied, and these claims (Counts II and III insofar as they relate to the Huntik Term Sheet) are *sua sponte* dismissed.

Under New York law, claims of quantum meruit and unjust enrichment are analyzed together as a single quasi-contract claim. *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir.2005). To recover in quasi contract, a plaintiff must establish: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Id.* (citing *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir.2000)).

A plaintiff may not, however, recover in quasi contract where the parties

have a valid, enforceable contract that governs the same subject matter as the claim for quantum meruit. *Id.* (citing *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)). A claim for "quasi contract" applies only "in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." *Id.* Since the Huntik Term Sheet is a contract, to which the parties' have expressly agreed to be bound, no claim lies in either quantum meruit or unjust enrichment. Plaintiffs will recover damages on their breach of contract claim, and so will be made entirely whole.

■ Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is also dismissed, *sua sponte.* "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir.2002) (quoting *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992)). Plaintiffs' claim for breach of the implied covenant is, therefore, duplicative of Plaintiffs' breach of contract claim. For that reason, Count IV is also dismissed.

■ An account stated is " 'an agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and the balance due, if any, in favor of one party or the other.' " *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff,* 638 F.Supp. 714, 719 (S.D.N.Y.1986) (citing *Chisholm–Ryder Co., Inc. v. Sommer & Sommer,* 70 A.D.2d 429, 431, 421 N.Y.S.2d 455 (N.Y.App.Div.1979)). A party asserting a claim for account stated must prove

it tendered the account and the opposing party did not object within a reasonable time. *See Rodkinson v. Haecker,* 248 N.Y. 480, 485, 162 N.E. 493 (1928). A party who fails to object within a reasonable time is bound by the account absent fraud, mistake or other equitable considerations. *Id.*

■ However, a claim for an account stated "cannot be made an instrument to create liability," nor may it "be utilized simply as another means to attempt to collect under a disputed contract." *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp. Inc.,* 171 A.D.2d 479, 567 N.Y.S.2d 404 (N.Y.App.Div.1991).

4Kids issued Invoice L108199 on July 30, 2009 with a due date of on or before December 18, 2009. (Newborn Decl. Ex. 6.) The Affidavit of Samuel R. Newborn, 4Kids' General Counsel, states "After Invoice No. L108199 remained unpaid, I personally contacted representatives of [Upper Deck] on several occasions regarding the invoice, including George Rikos, Corporate Counsel for [Upper Deck] who acknowledged that Invoice No. L108199 had been received, accepted and retained by [Upper Deck]." (Newborn Decl. ¶ 36.) This statement alone does not prove that Upper Deck failed to object to the account. It establishes, at most, that Upper Deck received the account.

■ Plaintiffs' claim for account stated is congruent with, and duplicative of, its claim for breach of contract for failure to pay the second installment of the Advance due under the Huntik Term Sheet. For that reason, the claim is dismissed.

## C. Plaintiffs' Claim for Attorneys' Fees Relating to the Huntik Term Sheet

Plaintiffs' request for attorneys' fees relating to the Huntik Term Sheet is denied

as premature, since the issues relating to their claim for breach of contract are not yet fully adjudicated.

## HUNTIK COMMERCIAL PRODUCTION AGREEMENT

### I. Contract Terms and Facts

On or about February 2009, the parties entered into a Commercial Production Agreement for the production of a thirty second commercial spot with a fifteen second "cut down" (collectively the "commercial spots") to promote the Huntik trading card game ("Huntik Production Agreement"). (Newborn Decl. Ex. 7, ¶ 1.) 4Kids assumed responsibility for the production of the commercial spots, including script writing, storyboards, casting, dialogue recording, sound editing, picture conforming, graphics editing, and mixing. *Id.* Upper Deck provided 4Kids with the music for the commercial spots.

On March 1, 2009, Upper Deck asked for a revision to the commercial spots, the cost of which was not to exceed $2,432.00. (Newborn Decl. Ex. 8.)

On March 31, 2009, 4Kids issued invoice P–100492 in the amount of $2,432.00 to Upper Deck for payment of the revision. *Id.* Ex 9. Upper Deck contends that it paid the invoice by check dated May 14, 2009. A copy Upper Deck's online account statement from Bank of America, showing a copy of the front and back of the check (with electronic endorsements of JPMorgan Chase Bank, NA) and also showing the date the check was posted as cashed, is included in the record. (Bernstein Decl. Ex. B.) The check is drawn on the account of The Upper Deck Company, LLC, and made payable to 4Kids Productions, Inc. at the address provided on the invoice. The check was posted to Upper Deck's account on May 28, 2009. The bank credited the amount to "Payee AEG." *Id.*

4Kids sues for non-payment of this invoice, claiming that it never received payment. But Plaintiffs offer no evidence to support its conclusion that it never received payment. AH the evidence is to the contrary. Therefore, not only is Plaintiffs' motion for summary judgment denied, but all of Plaintiffs' claims with respect to the Huntik Commercial Production Agreement are dismissed,

### II. Discussion

■ When a party makes a motion for summary judgment, the Court may search the record and grant summary judgment, not just to the moving party, but to any party who may be entitled to it-even if that party has not moved for relief. *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 114–15 (2d Cir.1999) (quoting *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir.1996)).

■ Here, Defendants have presented unrefuted evidence that they fully and timely paid Invoice P–100492. In response to Plaintiffs' motion for summary judgment, Defendants' produced a copy of a check in the amount of $2,432.00 drawn on Defendants' account at Bank of America and made out to 4Kids Production, Inc. The check was signed by Debra Histad (sic) and dated May 14, 2009. The check was cashed on May 28, 2009 by JPMorgan Chase Bank, NA ("Chase"). (Bernstein Decl. Ex. B.) Invoice P–100492 clearly identifies Chase as Plaintiffs' bank. (Newborn Decl. Ex. 9.)

On this evidence, a reasonable juror could only conclude that Defendants paid the invoice.

It is theoretically possible that someone other than a 4Kids employee cashed the check, or that Chase deposited the check in the wrong account. But that is not the responsibility of Upper Deck. Once Chase became the holder of the check on behalf

of 4Kids, their act of cashing the check satisfied Upper Deck's obligation to pay Invoice P–100492. *See* N.Y. U.C.C. Law §§ 3–201, 3–603(2), 3–604(3). If the bank made a mistake, Plaintiffs' remedy is to assert a claim against Chase—not against Defendants.

Because all claims relating to the Huntik Commercial Production Agreement depend for their viability on non-payment of the Invoice, and the evidence demonstrates that the Invoice was in fact paid, all of Plaintiffs' claims relating to the Huntik Commercial Production Agreement are dismissed.

## DINOSAUR KING COMMERCIAL PRODUCTION AGREEMENT

### I.  Contract Terms and Related Facts

On May 1, 2009, 4Kids began production of a twenty second commercial spot for Upper Deck to adapt a European commercial for American promotion. (Newborn Decl. Ex. 11.) A Work Authorization Form set forth the production services requested and listed consideration in the amount of $9,701.00. *Id.* 4Kids produced the commercial spot and delivered it to Upper Deck on May 11, 2009. (Newborn Decl. ¶¶ 75–76.)

On May 14, 2009, 4Kids began production on rush revisions to the same commercial spot, with the cost not to exceed $1,178.00, pursuant to a second Work Authorization Form. (Newborn Decl. Ex. 12.)

The parties executed a final Production Agreement June 2, 2009, detailing the terms of the production contract to adapt the Dinosaur King commercial spot. ("Dinosaur King Production Agreement"). (Newborn Decl. Ex. 10.) The Production Agreement was made retroactively effective as of May 1, 2009. *Id.* at 1. The agreement specifically provided that 4Kids would develop a commercial spot to promote the trading game based upon an existing commercial produced in Europe.

4Kids was responsible for supervising and coordinating the adaptation, including providing "casting, dialogue recording, sound editing, picture conforming, graphics editing and mixing." *Id.* at ¶ 1. As consideration, Upper Deck was required to pay 4Kids a production fee of $9,701.00. Upon execution of the contract, Upper Deck was required to pay 4Kids $4,701. The remaining $5,000 was to be credited to Upper Deck's Media Account, upon delivery of the final commercial spot. *Id.* at ¶ 5.

This agreement reflected in more detail the terms of the first Authorization form. It did not include the terms set forth in the second Authorization Form, including the $1,178.00 fee for the rush revisions.

The Production Agreement also contained indemnification provisions. Pursuant to the contract, Upper Deck agreed to indemnify 4Kids "against all actions, claims, liabilities and expenses, including reasonable attorneys' fees, arising out of or in connection with the breach by [Upper Deck] of any of the foregoing representations, warranties and obligations, provided that [Upper Deck] is given prompt written notice of any such action or claim." *Id.* at ¶ 9(a). 4Kids agreed to indemnify Upper Deck on the same terms. *Id.* at ¶ 9(b).

Additionally, the Production Agreement contained a merger clause, which provided that this agreement was "the entire understanding and agreement of the parties and supersedes all prior understandings and agreements with respect to the subject matter hereof, and any representation, promise or condition not specifically incorporated herein shall not be binding upon either party." *Id.* at ¶ 11(f).

On June 9, 2009, 4Kids sent Upper Deck an invoice P100504 in the amount of $5,879.00—$9,701.00 for the Dinosaur King commercial spot, less the $5,000.00 offset from the Upper Deck Media Account, plus an additional $1,178.00 for the rush revi-

sions authorized by the Second Authorization Form. (Newborn Decl. Ex. 13.) Upper Deck failed to pay the invoiced amount until 4Kids filed this lawsuit. Payment in the full amount of $5,879.00 was finally made on December 10, 2010. (Bernstein Decl. Ex. C.) 4Kids acknowledges receipt of payment. (Gray Decl. ¶¶ 16–17.) Nonetheless, 4Kids has sued for breach of contract and the other forms of relief discussed above.

## II. Discussion

### A. Breach of the Dinosaur King Commercial Production Agreement

■ Plaintiffs' motion for summary judgment on Count I, which alleges that Upper Deck breached the Dinosaur King Production Agreement, is granted.

The agreement provided that Upper Deck would pay $4,701 for services rendered on the contract. Plaintiffs completed production and delivered the Dinosaur King Adaptation to Upper Deck on or about May 11, 2009. Defendants failed to pay Invoice P100504 in the amount of $5,878.00 issued June 9, 2009 for eighteen months, until eight months after Plaintiffs' filed suit, and only days before its response to Plaintiffs' summary judgment motion was due.

Defendants claim that at least a portion of the invoice was for changes to the spot that were not authorized in writing. Nonetheless, it has paid the invoice in full.

Defendants suggest no reason why it was not liable to pay at least the portion of the invoice that it cannot and does not dispute—$4,701, representing the agreed-upon cost of the commercial ($9,701) less $5,000 credited from the Media Account. And they have paid the entire sum invoiced. Therefore, the only issue remaining ·is the value of interest on the sum invoiced from the time it was due and not paid until the date judgment is entered. Paying the invoice in full satisfies Plaintiffs' claim for the principal amount, but does not excuse the failure to make *timely* payment. Plaintiffs are entitled to damages in the form of interest commencing thirty days after the invoice was issued.

Plaintiffs also seek recovery of attorneys' fees incurred in obtaining payment of the Dinosaur King invoice—which required the filing of this lawsuit. Needing a contractual provision to overcome the usual rule that each party bears its own attorneys' fees, Plaintiffs point to the indemnification provision in the Dinosaur King Production Agreement, which provides that Upper Deck will hold 4Kids harmless "from and against any and all claims, damages, liabilities, costs and expenses, including reasonable outside attorneys' fees, arising from any breach by [Upper Deck] of any of the foregoing representations, warranties and obligations."

■ Under New York law, a provision for indemnification of attorneys' fees will be enforced but only if it is unmistakably clear that the parties intended to provide for payment of attorneys' fees relating to disputes between themselves. *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 178–79 (2d Cir.2005). Where an indemnification provision can be read to encompass claims that could be asserted by a third party, a New York court will hold that the agreement to indemnify for attorney's fees does not unmistakably refer to disputes between the contracting parties, and so will not allow the indemnity agreement to serve as a way around the usual rule. *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13 (2d Cir.1996). In *Hooper Associates v. AGS Computers*, 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 548 N.E.2d 903 (N.Y.1989), the New York Court of Appeals read an indemnification clause and observed that the provision's list of potential grounds for

claims were all "susceptible to third-party claims, while none was 'exclusively or unequivocally referable to claims between the parties themselves.'" As a result, the court rejected the winning side's attempt to extract an award of attorneys' fees out of the indemnification clause.

The parties have briefed the attorneys' fees issue exclusively with reference to the Huntik Term Sheet, which specifically requires each party to indemnify the other for reasonable attorneys' fees arising from claims for "breach ... of any ... duties and/or obligations hereunder." Since the Term Sheet sets out various duties and obligations that 4Kids undertakes *vis a vis* Upper Deck, and vice versa, the plain language of the Term Sheet contemplates payment of attorneys' fees in actions for breach brought by one party to the contract against the other.

██ The indemnification clauses in the Dinosaur King Production Agreement are worded differently. They provide for fee indemnification in an action arising out of or in connection with "the breach by [Upper Deck] of any of the *foregoing* representations, warranties and obligations." Review of the Agreement reveals that, while breaches of certain of the representations and warranties (as to ownership of rights, for example) could give rise to an action by a third party, the only obligations imposed by the terms of the Dinosaur King Production Agreement (*i.e.*, the "foregoing" obligation) are obligations as between the parties. The contract does not give rise to any "obligations" by either party to any third party. Therefore, the indemnification agreement refers unequivocally to claims for breach of contract to make payments due under the contract, and an award of attorneys' fees is authorized under New York law.

██ However, the Court will not be awarding any attorneys' fees incurred from and after the date when the invoice was satisfied. No such award would, in my opinion, be reasonable. That precludes any award of attorneys' fees for the time expended on this silly summary judgment motion.

Furthermore, any fee application must be only for time that is unequivocally referable to the assertion in this lawsuit of the claim under the Dinosaur King Commercial Production Agreement. If that time cannot be separately accounted for, no fees will be awarded.

Insofar as the Dinosaur King Commercial Production Agreement is concerned, Plaintiffs' duplicative claims for relief on other theories are dismissed for the reasons discussed above.

## CONCLUSION

There remains to be decided (1) damages due to Plaintiffs for Defendants' breach of the Huntik Term Sheet; (2) the amount of interest due to Plaintiffs for Defendants' breach of the Dinosaur King Commercial Production Agreement; (3) attorneys' fees, if any, attributable to the assertion of the Dinosaur King Commercial Production Agreement claim for breach of contract; and (4) attorneys' fees that may (or may not) end up being awarded pursuant to the Huntik Term Sheet. The parties are expected to be ready for trial on these matters on 48 hours notice, unless within thirty days they agree to a procedure for ascertaining damages that can be done on papers or referred to the Magistrate Judge,

The counterclaims are stayed; the motion addressed to the counterclaims is deemed withdrawn.

The Clerk is directed to remove the motion at docket entry 16 from the Court's list of pending motions.

This constitutes the decision and order of the Court.