## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
August 4, 2016

Lyle W. Cayce
Clerk

————

No. 15-30914

————

LOUISIANA GENERATING, L.L.C.; NRG ENERGY, INCORPORATED,

      Plaintiffs - Appellees

v.

ILLINOIS UNION INSURANCE COMPANY,

      Defendant - Appellant

————————————

Appeal from the United States District Court
for the Middle District of Louisiana

————————————

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The EPA accused Louisiana Generating ("LaGen") of violating the Clean Air Act. In an ensuing consent decree, LaGen promised to upgrade part of its power plant, surrender emissions allowances, and fund various environmental projects. LaGen asked its insurer, Illinois Union ("ILU"), to pay the costs of these measures, arguing that they qualified as "remediation costs" under LaGen's policy. ILU refused. The district court entered summary judgment for LaGen, finding that the policy bound ILU to pay LaGen's costs in full. We VACATE and REMAND.

No. 15-30914

I

We summarized the early history of this dispute in a prior opinion:

[This case concerns] Big Cajun II ("BCII"), a coal-fired electric steam generating plant owned by LaGen in Louisiana. In February 2005 and December 2006 the EPA sent LaGen Notices of Violation ("NOVs") alleging that certain major modifications performed without a permit at BCII in 1998 and 1999 caused net emissions increases in violation of the [Clean Air Act]. In January 2009, NRG Energy, LaGen's parent, purchased a Custom Premises Pollution Liability Insurance Policy ("the [P]olicy") from ILU to cover a large number of its facilities, including BCII. The effective date of the [P]olicy is January 22, 2009.

On February 18, 2009, the EPA filed . . . suit over the modifications made to BCII, asserting violations of the [Clean Air Act] and Louisiana environmental laws. . . . The suit allege[d] that the previous owner of BCII did work on the plant that increased certain emissions which under applicable law would be considered "major modifications" and would have required a Prevention of Significant Deterioration of Air Quality permit ("PSD permit") before being completed. The suit also allege[d] that the plant modifications failed to employ best available control technology ("BACT") to limit emissions, as required by the CAA and Louisiana law. The complaints allege[d] that since acquiring BCII, LaGen ha[d] continued to operate the plant without seeking a PSD permit for the modifications. As a result, the complaints assert[ed], BCII ha[d] emitted excess amounts of regulated pollutants into the air. . . .

LaGen sought coverage from ILU under the [P]olicy for legal fees associated with the underlying EPA suit, and ILU denied that the EPA suit was covered by the [P]olicy. LaGen filed suit in Louisiana federal court seeking a declaratory judgment that ILU ha[d] a duty to defend and indemnify LaGen in the EPA suit. The district court bifurcated the trial between the duty to defend and the duty to indemnify. . . . In a January 30, 2012 order, the district court granted summary judgment for LaGen with regard to the

2

No. 15-30914

duty to defend and denied the motion for summary judgment filed by ILU.[1]

On ILU's motion, the district court certified its January 30 order for interlocutory appeal under 28 U.S.C. § 1292(b). We accepted the appeal and affirmed, finding that the relief the EPA sought, including civil penalties, the surrender of LaGen's emission allowances, and "other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the [alleged] violations," potentially fell within the [P]olicy's coverage for "'claims, remediation costs, and associated legal defense expenses . . . as a result of a pollution condition' at a covered location."[2] Because New York law, which governs the Policy, gave insurers an "exceedingly broad" duty to defend, enforceable "whenever the allegations of the complaint suggest . . . a reasonable possibility of coverage," ILU had a duty to defend LaGen against the EPA's allegations.[3]

---

[1] *Louisiana Generating L.L.C. v. Illinois Union Ins. Co.*, 719 F.3d 328, 331-32 (5th Cir. 2013) (footnote omitted).

[2] *Id.* at 332-34.

[3] *Id.* at 333-34 (quoting *BP Air Conditioning Corp. v. One Beacon Ins. Grp.*, 871 N.E.2d 1128, 1131 (N.Y. 2007)). LaGen broadly alleges that in this appeal, ILU "ignores key [prior] rulings from this court concerning the meaning of the pollution policy" and "fails to recognize the import" of the earlier decision. But LaGen does not appear to argue that we previously resolved any of the specific issues now in dispute.

The district court, for its part, seemed to suggest that our earlier decision held that "remediation" should be understood as synonymous with the dictionary definitions of "abate" and "mitigate." If this was the district court's view, it was mistaken. In fact, we stated only that under the Policy, "'[r]emediation costs' are defined very broadly to include expenses incurred to redress pollution in compliance with environmental law, including, inter alia, costs associated with investigating, mitigating or abating pollution. This language . . . potentially covers the multiple prayers for relief in the EPA complaint which seek to require LaGen to mitigate, offset and remediate the alleged past pollution." *Louisiana Generating*, 719 F.3d at 335. As this excerpt makes clear, we did not explain the meaning of "mitigate" or "abate" in our earlier decision, nor did we hold that the costs of the measures the EPA sought were "remediation costs." Nor did we need to: in the prior appeal, our task was to determine whether the Consent Decree Measures (which had not yet been finalized) *potentially* were remediation costs, and in turn, whether there was a "reasonable possibility" that the Policy's terms encompassed them. *Id.* at 335 (emphasis added).

No. 15-30914

Around the same time, the EPA and LaGen settled the underlying dispute and negotiated a consent decree. In relevant part, the decree required LaGen to (1) install selective non-catalytic reduction ("SNCR") technology upgrades at Unit 3 of BCII, a part of the plant not alleged to have been out of compliance in the EPA's suit; (2) surrender certain emissions allowances;[4] and (3) pay for a variety of "environmental mitigation projects."[5]

LaGen sought indemnification from ILU for the costs of these measures (hereinafter the "Consent Decree Measures"), asserting that they were "remediation costs" under the Policy. ILU refused. Both parties then moved in the ongoing district court action for summary judgment on the indemnification issue. In the alternative, ILU moved to postpone summary judgment proceedings to allow further discovery.

The district court granted summary judgment for LaGen. First, the court found that the Policy's "remediation costs" language encompassed projects that generally offset pollution or moderated its effects, rather than only projects that physically removed or contained pollution. Second, it found that each of the Consent Decree Measures would "remediate" pollution in this way, obligating ILU to pay for them. Third, it found that the costs LaGen incurred to complete the Consent Decree Measures were reasonable, entitling the company to coverage in full. The court also denied ILU's request for a continuance and further discovery, stating that ILU "failed to satisfactorily explain its position to the Court."

ILU appealed.

---

[4] An emissions allowance confers the right to emit a certain amount of pollution.

[5] These included electric vehicle infrastructure improvements throughout southern Louisiana; restoration of national parks, United States Forest Service lands, and a nearby lake; solar panel installation "at local schools, government-owned facilities, or facilities owned by nonprofit groups"; energy efficiency upgrades; and other projects yet to be defined.

## II

"This court reviews the district court's grant of summary judgment de novo, applying the same legal standards as the district court."[6] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7] "The court must view the facts developed below in the light most favorable to the non-moving party."[8]

New York law governs the Policy.[9] As the Second Circuit explained in another insurance coverage dispute:

> Under New York law "the initial interpretation of a contract is a matter of law for the court to decide." Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous. An ambiguity exists where the terms of a contract could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Ambiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language. Hence, "only where the language and the inferences to be drawn from it are unambiguous" may a district court "construe a contract as a matter of law and grant summary judgment accordingly."
>
> If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence. If the court finds

---

[6] *Louisiana Generating L.L.C. v. Illinois Union Ins. Co.*, 719 F.3d 328, 333 (5th Cir. 2013) (citation omitted).

[7] FED. R. CIV. P. 56(a).

[8] *Saenz v. Harlingen Med. Ctr., L.P.*, 613 F.3d 576, 577 (5th Cir. 2010).

[9] *Louisiana Generating*, 719 F.3d at 333 ("The policy contains a choice of law clause specifying that 'All matters arising hereunder including questions relating to the validity, interpretation, performance, and enforcement of this Policy shall be determined in accordance with the law and practices of the State of New York.' Thus, New York law governs the interpretation of the policy.").

that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.[10]

Finally, we review the district court's discovery ruling for abuse of discretion.[11]

### III

ILU argues that none of the expenses LaGen has incurred (or will incur) in performing the Consent Decree Measures are "remediation costs" eligible for indemnification. ILU's argument is in three parts. First, ILU claims that indirect mitigation efforts are not "remediation." Second, ILU claims that even if they are, the Consent Decree Measures do not actually mitigate past pollution as the Policy requires. Third, ILU claims that LaGen's expenses are partially unreasonable. We address each argument in turn.

ILU first and most broadly contends that projects, like the Consent Decree Measures, that may indirectly reduce past pollution and its effects do not fall under the Policy's "remediation costs" provision. The Policy covers "'remediation costs' . . . as a result of a 'pollution condition' on, at, under, or beyond the boundaries and that migrated from the 'covered location(s).'"[12] It defines "remediation costs" to include "reasonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat,

---

[10] *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted) (quoting *K. Bell & Assoc., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997); and *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir. 1990)). *See also Jefferson Block 24 Oil & Gas, L.L.C. v. Aspen Ins. UK Ltd.*, 652 F.3d 584, 589 (5th Cir. 2011) (reviewing relevant New York law). The Second Circuit is, of course, "intimately familiar with the nuances of New York law," so we take care to note its relevant cases here and elsewhere in this opinion. *In re E.F. Hutton Sw. Props. II, Ltd.*, 953 F.2d 963, 972 (5th Cir. 1992).

[11] *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 534 (5th Cir. 1999).

[12] The single quotation marks denote terms specially defined by the Policy. BCII is undisputedly a "covered location."

neutralize, or immobilize 'pollution conditions' to the extent required by 'environmental law.'" ILU argues that this definition cannot possibly encompass the costs for which LaGen seeks indemnification. According to ILU, a reasonable interpreter familiar with the customs and usages of modern-day business practice would understand "remediation," in the air pollution context, to connote only "*physically* remov[ing], contain[ing], or treat[ing] contaminants already in the air or address[ing] harms they caused to land, water, structures, animals, or persons."

Because the Consent Decree Measures cannot and do not accomplish this, ILU insists, they are not remediation measures, and LaGen's expenses in carrying them out are not "remediation costs" under the Policy.[13] ILU acknowledges that some of the words the Policy uses in defining "remediation costs," chiefly "mitigate" and "abate," appear to suggest a broader notion of remediation, but argues that those words are better understood to denote direct, physical remediation, and must in any event be "read in a manner consistent with the 'remediation costs' they define, not to stretch the concept of 'remediation' beyond its logical limits." Even assuming, then, that the Consent Decree Measures indirectly offset the harm of BCII's past pollution, they are still not "remedial" in nature, and their costs are not "remediation costs."[14]

The district court rejected ILU's argument. It interpreted New York law to reject "the maxim that 'environmental law terms' should be treated as 'terms of art,' [and] instead demonstrate[] that ambiguous terms are interpreted against insurers and in a manner that a reasonable businessperson would

---

[13] The parties appear to agree that BCII's past emissions cannot be "remediated" by any means (including the Consent Decree Measures) under ILU's definition of the term.

[14] As discussed below, ILU does not concede that the measures actually offset the harm of BCII's past pollution, whether directly or indirectly.

expect." Accordingly, the court opined, "'mitigate' and 'abate' are to be given a construction congruent with their plain meaning and the expectations of a reasonable insured." The court concluded that these terms' "plain meaning" included their "traditional[]" dictionary definitions, and applied those broad definitions in determining whether the Consent Decree Measures qualified as "remediation" under the Policy.[15]

In our view, this was error – at least at the summary judgment stage. Under New York law, courts can and often must look beyond the dictionary and other such general-purpose sources in reading contracts: when a term in a contract has a special, widely understood meaning in the business context in which the contract was executed, that meaning bears on the proper interpretation of the term.[16] The court below gestured toward this principle in mentioning the "reasonable businessperson's" expectation. But fully applying the principle leads to a more equivocal result than that court reached.

On one hand, there is considerable evidence that in environmental law and related business practice, the term "remediation" is primarily used to refer to the physical, geographically focused containment and removal of pollutants and the damage they have caused, not to measures that indirectly reduce their effect in the broader environment.[17] In particular, "remediation" is associated

---

[15] Specifically, the district court wrote that "the definition of "mitigate" traditionally includes the notion of becoming "'less severe'" or "'less harsh or hostile.'" Similarly, "abate" is often defined using language such as "'reduce in degree'" or "'moderate.'" . . . [T]he Court will use the plain meaning of "mitigate" and "abate" to determine whether either party is entitled to summary judgment." The court was quoting a LaGen memorandum that in turn quoted the Merriam-Webster dictionary.

[16] *See, e.g.*, *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000); *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 609 N.E.2d 506, 513 (N.Y. 1993) (relying in part on certain words' meanings as "terms of art in environmental law" in finding an insurance contract ambiguous); *Colonial Oil Indus. Inc. v. Indian Harbor Ins. Co.*, 528 F. App'x 71, 75 (2d Cir. 2013) (unpublished) (relying on certain words' meanings as "terms of art in environmental law" in finding that an insurance contact unambiguously provided coverage).

[17] *See, e.g.*, 26 U.S.C. § 198(b)(1) (2012) ("The term 'qualified environmental remediation expenditure' means any expenditure . . . which is paid or incurred in connection with the

No. 15-30914

with the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), which provides for the physical control and cleanup of toxic contamination of specific sites.[18] Thus, we credit ILU's argument that the Consent Decree Measures go beyond what most informed practitioners would consider "remediation."

The most obvious rejoinder, and one that LaGen presses, is that the Policy does not rely on the typical meaning of "remediation." Instead, it substitutes its own definition, which incorporates the capacious terms

---

abatement or control of hazardous substances at a qualified contaminated site."); 42 U.S.C. § 9601(24) (2012) (offering, as examples of "remedial action," the following: "storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies . . . ."); *Glossary: R*, FED. REMEDIATION TECH. ROUNDTABLE (May 17, 2016), https://frtr.gov/glossary/rterms.htm ("Remediation: 1. Cleanup or other methods used to remove or contain a toxic spill or hazardous materials from a Superfund site; 2. for the Asbestos Hazard Emergency Response program, abatement methods including evaluation, repair, enclosure, encapsulation, or removal of greater than 3 linear feet or square feet of asbestos-containing materials from a building."); *Remediation Rules*, TEX. COMM'N ON ENVTL. QUALITY (Oct. 23, 2014), https://www.tceq.texas.gov/remediation/remediationrules.html ("Remediation programs . . . oversee the assessment and cleanup of contaminated properties."); James Hamilton, *Careers in Environmental Remediation*, BUREAU OF LABOR STATISTICS (Sept. 2012), http://www.bls.gov/green/environmental_remediation /remediation.pdf ("Environmental remediation is the removal of pollution or contaminants from water (both ground water and surface water) and soil. . . . Remediation restores brownfield sites either for redevelopment or to return them to their natural state.").

    One could plausibly argue that this sort of evidence is extrinsic and factual in nature, and thus should not be used to *find* ambiguity, but rather only to *resolve* it. *See, e.g.*, *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998); *see generally Antilles S.S. Co. v. Members of Am. Hull Ins. Syndicate*, 733 F.2d 195, 203 (2d Cir. 1984) (Newman, J., concurring) (discussing the fuzzy line between legal and factual determinations in contract interpretation). However, New York law appears to contemplate that courts will consider industry usage as part of their threshold, legal determinations of whether contractual terms are ambiguous. *See Alexander & Alexander Servs.*, 136 F.3d at 86 (whether ambiguity is present turns in part on "customs, practices, usages and terminology as generally understood in the particular trade or business" (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997))).

[18] Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 (2012).

"mitigate" and "abate" (among others). LaGen correctly notes that these terms are routinely used to refer to indirect, non-physical remedial efforts, both in common speech and in industries subject to environmental regulation.[19]

But even though the Policy uses these broad words to define "remediation costs," New York law suggests that the usual, narrower meaning of that term is still relevant. In *Belt Painting Corp. v. TIG Insurance Co.*, the New York Court of Appeals considered an insurance policy that excluded coverage for harms caused by "pollutants," which the policy defined to include "any solid, liquid, gaseous or thermal irritant or contaminant including . . . fumes." The court found that "reasonable minds [could] disagree as to whether the exclusion" barred coverage for claims of injury due to indoor exposure to paint fumes, and accordingly rejected the insurer's claim that the contract was unambiguous on this point. It reasoned that the insurer's literal, broad reading of the policy's definition of "pollutants" would "infinitely enlarge the scope of the term 'pollutants,' and seemingly contradict both a 'common speech' understanding of the relevant terms and the reasonable expectations of a businessperson."[20] *Belt Painting* indicates that in New York, when a contract's specific, facially expansive definition of a term is in tension with the term's usual meaning, the former does not control as a matter of law; rather, the tension may indicate ambiguity.[21]

---

[19] *See, e.g.*, *supra* note 15; U.S. Envtl. Prot. Agency, Office of Civ. Enforcement, Securing Mitigation in Injunctive Relief in Certain Civil Enforcement Settlements (2nd Edition), (Nov. 14, 2012), at 2-3, https://www.epa.gov/sites/production/files/2013-10/documents /2ndeditionsecuringmitigationmemo.pdf; *see also infra* notes 43-44 and accompanying text.

[20] 795 N.E.2d 15, 20 (N.Y. 2003); *see also Harris v. Allstate Ins. Co.*, 127 N.E.2d 816, 817 (N.Y. 1955) ("The words of the policy are to be read in context, the language construed fairly and reasonably, with an eye to the object and purpose sought to be accomplished by the writing.").

[21] LaGen objects that *Belt Painting* concerned a pollution exclusion clause, which under New York law was to be read narrowly; no such canon applies to a clause *conferring* coverage. *See Belt Painting*, 795 N.E.2d at 17 ("[P]olicy exclusions are given a strict and narrow construction, with any ambiguity resolved against the insurer."). Nonetheless, *Belt Painting* is still instructive in this case. In parsing the exclusion clause's definition of "pollutant" and

No. 15-30914

LaGen's other arguments have force, but ultimately do not dispel the prospect of ambiguity. LaGen notes that ILU's focus on "CERCLA-type" cleanups is unmoored from the actual text of the Policy. Indeed, the Policy states that remediation costs include those required by "environmental law," which it defines very broadly;[22] in contrast, other parts of the Policy specifically invoke CERCLA. If ILU meant to limit "remediation" to the CERCLA context, the argument goes, it could and would have done so expressly. We find this plausible, but note that ILU does not claim on appeal that the "remediation costs" provision only has effect in the CERCLA context. Rather, the thrust of its arguments, both in the court below and in this one, was that CERCLA-mandated remediation *exemplified* the type of activity that might generate covered "remediation costs."

LaGen also claims that ILU's interpretation would render the Policy's coverage partially illusory, since BCII's past pollution cannot be remediated under ILU's definition of that term (as the parties appear to agree).[23] ILU responds that other provisions of the Policy, such as those relating to civil

---

deeming it ambiguous, the Court of Appeals did not invoke its duty to read the clause narrowly; rather, it applied the more general rule, equally applicable in this case, that contracts should be interpreted with context, common sense and typical business usage in mind. *Belt Painting*, 795 N.E.2d at 20-21; *see also Colonial Oil Indus. Inc. v. Indian Harbor Ins. Co.*, 528 F. App'x 71, 75 (2d Cir. 2013) (unpublished) (resolving another dispute over the scope of a pollution exclusion clause using only the same general rules, and not referring to the narrow-reading canon).

[22] Under the Policy, "environmental laws" include "any federal, state, provincial, municipal or other local laws, statutes, ordinances, rules, guidance documents (and governmental, judicial or administrative orders, correspondence and directives), regulations, and all amendments thereto . . . governing the liability or responsibilities of the 'insured' with respect to 'pollution conditions.'"

[23] Relatedly, LaGen further argues that restricting the meaning of "mitigation" and the other general terms in light of the typical definition of "remediation" renders the former terms superfluous. *See, e.g., In re Viking Pump, Inc.,* 52 N.E.3d 1144, 27 N.Y.3d 244, 257 (N.Y. May 3, 2016) (insurance policies are interpreted to give effect to every term and to avoid surplusage). But *Belt Painting* strongly suggests that the canon against surplusage is not a trump card. Indeed, the *Belt Painting* court read a policy definition that explicitly used the word "fumes" not to encompass paint fumes. 100 N.Y.2d at 387.

penalties and claims for bodily injury and property damage, allow coverage for air pollution costs. But LaGen's basic point remains. If BCII's emissions can't be remediated, then the Policy implicitly contemplates an impossibility: it provides coverage for "remediation costs" resulting from "pollution conditions" caused by BCII, and "pollution conditions" are defined elsewhere to include air pollution.[24] Thus, on ILU's account, the Policy provides coverage for expenses that could never possibly exist (i.e., remediation costs arising from BCII's emissions). Again, the argument has force, but we do not find that this tacit, mechanically arising contradiction suffices to render ILU's reading wholly absurd and therefore unambiguously wrong[25] – especially since even under ILU's reading, the contract indisputably still provides significant coverage for expenses related to air pollution at BCII.

In sum, we consider neither party's analysis of the term "remediation" entirely satisfying. Much like the insurer in *Belt Painting*, LaGen offers an interpretation far more expansive than that term's typical connotation among informed practitioners. ILU's interpretation avoids this problem, but arguably conflicts with the Policy's particular and facially capacious definition and also raises the specter of contradictions within the Policy itself. Given the pros and cons of each reading, we conclude that a "reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in th[is] particular . . . business" could plausibly adopt either one.[26]

---

[24] The Policy states that "'[p]ollution conditions' means the discharge, . . . dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including, but not limited to, smoke, soot, vapors, fumes . . . on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.").

[25] *See, e.g., In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003).

[26] *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998).

Thus, the scope of the term "remediation costs," as used in the Policy, is ambiguous and must be resolved, if possible, in light of extrinsic evidence.[27]

That job is typically for the trier of fact.[28] Indeed, the Second Circuit has repeatedly suggested that under New York law and the Federal Rules, when a contract is ambiguous and extrinsic evidence of the parties' actual intent exists, summary judgment is categorically impermissible.[29] However, other authority suggests that if a court finds the extrinsic evidence overwhelmingly favorable to one side, judgment as a matter of law may be appropriate.[30]

---

[27] *See generally In re Viking Pump, Inc.,* 52 N.E.3d 1144, 27 N.Y.3d 244, 258 (N.Y. May 3, 2016) ("[A] contract is not ambiguous 'if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" (quoting *Selective Ins. Co. of Am. v. County of Rensselaer*, 47 N.E.3d 458, 461 (N.Y. 2016))).

[28] *State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985). Under New York law, interpretation of an ambiguous contract remains a matter of law if there is no extrinsic evidence or if the extrinsic evidence is "itself conclusory and *will not* resolve the equivocality of the contract." *Id.* (emphasis added); *Hartford Acc. & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909-10 (N.Y. 1973). Neither is true here: the parties have submitted extrinsic evidence that could potentially shed light on the actual intent behind the Policy, and the evidence is not conclusory.

[29] *See Alexander & Alexander Servs.,* 136 F.3d at 86 ("If the court must resort to extrinsic evidence to ascertain the correct and intended meaning of a term, material questions of fact necessarily exist. . . . Consequently, only where the court finds that the terms are unambiguous, or where no extrinsic evidence exists, may it properly grant summary judgment to one of the parties."); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *Union Ins. Soc. of Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946, 950 (2d Cir. 1965).

[30] *See Jefferson Block 24 Oil & Gas, L.L.C. v. Aspen Ins. UK Ltd.*, 652 F.3d 584, 589 (5th Cir. 2011) ("Once the court has concluded that the policy is ambiguous, the burden shifts to the insurer to prove that its proposed interpretation of the policy is the correct one. At this stage, 'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.' If the extrinsic evidence is 'so one-sided that no reasonable person could decide the contrary,' the court may resolve the ambiguity as a matter of law. 'If it is not, the extrinsic evidence must be interpreted by the factfinder.'" (quoting *Morgan Stanley*, 225 F.3d at 276, and *Sarinsky's Garage Inc. v. Erie Ins. Co.*, 691 F. Supp. 2d 483, 486 (S.D.N.Y. 2010))); *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008); *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) ("[S]ummary judgment in a contract dispute may be granted 'when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of

No. 15-30914

We need not resolve this apparent tension. Even if the latter view is correct, the available extrinsic evidence does not favor LaGen's interpretation so heavily as to prevent a reasonable factfinder from concluding that the parties intended a more traditional notion of "remediation."[31] Accordingly, a genuine dispute of fact exists, and the district court's entry of summary judgment cannot stand.[32]

IV

ILU's second argument concerns the actual effect of the Consent Decree Measures. Having determined that the Policy's "remediation costs" provision extended to indirect geographically non-specific efforts, the district court considered whether the specific costs in dispute – i.e., the costs of the Consent Decree Measures – actually "remediated" LaGen's past pollution in this way, and concluded that they did. ILU claims this was error, and in turn, that the cost of the Consent Decree Measures is not covered under the Policy even if LaGen's broad construction of "remediation costs" is correct. Although this

---

law.'" (interpreting and quoting *Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999))).

[31] Most of the parties' assertedly extrinsic evidence pertains to the typical connotations of the terms "remediation," "mitigate," and "abate." *See supra* notes 17-19 and accompanying text. As discussed above, it is unclear whether this evidence is really extrinsic evidence to be considered after a finding of ambiguity, or interpretive evidence to be weighed in determining whether ambiguity exists. *See supra* note 17. Regardless, the evidence gives each side additional grist for the mill, as discussed above, and does not overwhelmingly favor one side or the other. The remaining relevant extrinsic evidence most prominently includes an expert report averring that environmental insurance policies like the Policy have historically been used to cover costs from CERCLA-type cleanups and that insureds typically buy them for that reason. This evidence favors ILU's account of the parties' intent and thus weighs against summary judgment.

[32] *See also Stern v. Cigna Grp. Ins.*, No. 07-0772-CV, 2008 WL 4950067, at *1 (2d Cir. Nov. 20, 2008) (summary order) (vacating summary judgment in a dispute over an ambiguous contract because the available extrinsic evidence, although "not conclusive in . . . favor [of the nonmovant] . . . *could* resolve the ambiguity [in its favor]," and opining that the district court's "use of *contra proferentem* was premature. The rule may ultimately play a role in this case, but only as a 'principle of last resort, to be invoked when efforts to fathom the parties' intent have proved fruitless.'" (alteration adopted) (quoting *Record Club of Am., Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989))).

argument will become irrelevant if LaGen's broad construction is rejected on remand, we address it in the interest of judicial economy.[33]

ILU's argument is essentially twofold. First, ILU focuses on LaGen's upgrades to Unit 3 of BCII.[34] Pursuant to the consent decree, LaGen spent some $20.6 million installing SNCR technology at Unit 3 of BCII. (LaGen's alleged violations implicated Units 1 and 2 of the plant only.) The district court found that by reducing Unit 3's emissions, this new technology indirectly mitigated the excess emissions from the other units, thereby "remediating" them: "[The excess emissions] have effects on the environment, and by reducing future emissions, the past emissions can be 'remediated' as the

---

[33] The district court has already ruled that the Consent Decree Measures indirectly mitigate LaGen's past pollution. If we leave that issue open, and, on remand, the trier of fact finds that "remediation costs" include costs of indirect mitigation efforts, it will then have to consider it anew. Whichever party is aggrieved by its resolution of the issue will then likely appeal. We address the issue here in order to prevent multiple appeals. *See, e.g.*, *United States v. Marine Shale Processors*, 81 F.3d 1361, 1369 n.8 (5th Cir. 1996) ("Despite the fact that we vacate and remand the district court's Rule 54(b) judgment on other grounds, we reach the United States' arguments concerning instructional and evidentiary error. . . . Judicial economy counsels that we reach these issues now, so that any error may be corrected in a single proceeding on remand."); *United States v. Adamson*, 665 F.2d 649, 656 n.19 (5th Cir. Unit B 1982), *rev'd in part on other grounds on reh'g en banc*, 700 F.2d 953 (5th Cir. Unit B 1983) ("It is common practice for an appellate court to consider and decide issues which are fully presented and litigated and which will likely arise on retrial, even though such decision may not be necessary to support the narrow decision to reverse."); *United States v. Robinson*, 625 F.2d 1211, 1219 n.13 (5th Cir. 1980) ("We recognize that, on remand, the district court may find that no "seizure" occurred or that, if it occurred, it was lawful, which would obviate the necessity for considering whether the cocaine was the product of an unlawful seizure. Nevertheless, because the district court may find that an unlawful seizure occurred, we deem it necessary, in the interest of judicial economy, to reach the issue whether the consent to search was tainted. Therefore, we assume for purposes of this discussion that an unlawful seizure occurred.").

[34] ILU essentially repeats its Unit 3 arguments in disputing whether LaGen's surrender of emissions allowances constituted "remediation." The arguments are unavailing as to Unit 3, as described below, and are equally unavailing as to the allowances. ILU does note, in passing, that the allowances are to be surrendered in perpetuity, "by definition far beyond what any remediation of existing contamination might require even in theory." But it appears that LaGen only seeks indemnification for the surrender of allowances through 2017 in this action.

environment naturally eliminates the chemicals and, due to the lower emissions, there are fewer new chemicals to take their place."

ILU disputes whether such indirect attenuation can amount to "remediation" under the Policy, as discussed above. But in any event, ILU argues, the Unit 3 upgrades do not in fact attenuate the past, allegedly excessive emissions from Unit 1 and 2. Rather, they offset *future* emissions from those units.[35] Because "remediation" under the Policy must address past pollution – a point that the district court accepted and LaGen does not dispute – the Unit 3 upgrades are not "remedial."[36] At times, ILU phrases this argument differently, asserting that the upgrades are "compliance" measures meant to ensure Units 1 and 2's prospective compliance with environmental laws.[37] Stated either way, the basic point is the same: any emissions avoided

---

[35] ILU also appears to argue that the Consent Decree Measures cannot be considered to offset past emissions because BCII is still emitting more than the law requires or than it did before the EPA's suit. It's unclear whether that's true, as it has not been established whether and to what extent LaGen actually violated the Clean Air Act. Regardless, ILU's argument is unpersuasive. Any action that slows the rate of emissions into the atmosphere should allow the emissions already present, which include past emissions, and the harms they caused to diminish faster than they would have absent that action, regardless of whether the law requires more. *See infra* note 39 and accompanying text.

[36] *Cf. Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 582 (Ind. 2007) ("Notwithstanding the federal lawsuit's various references to seeking relief that would "remedy" past violations and harm to public health, the power companies acknowledge that the injunctive remedy sought by the federal lawsuit is 'to force Cinergy to install equipment to contain any *further* excess emissions and allow the environment to recover.' The federal lawsuit is directed at preventing future public harm, not at obtaining control, mitigation, or compensation for past or existing environmentally hazardous emissions." (citation omitted)).

[37] In its prior Fifth Circuit appeal, LaGen did not assert that "remediation" included "costs associated with installation of government mandated equipment and other actions taken *solely* to bring the plant into compliance." *Louisiana Generating L.L.C. v. Illinois Union Ins. Co.*, 719 F.3d 328, 335 (5th Cir. 2013) (emphasis added). ILU stretches the record somewhat in stating that "if any of the Consent Decree costs are 'compliance' costs, they are by LaGen's own admission not covered by the Policy." This basic notion appears in various forms throughout ILU's briefing.

through the Unit 3 upgrades must be credited against future emissions, not past ones.[38]

We are not persuaded. Because of BCII's past emissions, there are today more pollutants and pollutant byproducts in the region's air, and more pollution-related damage to natural resources, than there would be absent the past emissions. Future emissions contribute to this geographically diffuse, intermingled body of harm exactly the same way. And crucially, future emissions *reductions* accelerate the diminution of that body of harm; they do not operate specifically on emissions released at any particular time.[39] For this reason, the Unit 3 upgrades do not mitigate only past emissions or only future emissions in any meaningful sense. Rather, the upgrades accelerate the diminution of a homogenous body of pollution and pollution-related damage that arose at least in part from past emissions. Therefore, the upgrades mitigate past pollution.

ILU also uses the structure and terminology of the consent decree, as well as records of LaGen's negotiations with the EPA, to argue that the parties meant to substitute Unit 3 upgrades for more extensive upgrades to Units 1 and 2, as part of an effort to reduce BCII's overall emissions. Indeed, BCII is now subject to a plant-wide Clean Air Act emissions permit, and the Unit 3 upgrades appear necessary for the plant's emissions to stay under the permitted limit. Thus, ILU concludes, the Unit 3 upgrades were meant to and in fact "ensure[] BCII's overall compliance with the law going forward, rather

---

[38] To the extent ILU's "compliance" argument has content other than this – i.e., to the extent ILU argues that any action required by the Clean Air Act or similar authorities cannot be "remediation" – we find it unconvincing. *See infra* note 41 and accompanying text.

[39] The mechanism is as the district court described. Pollution and related harms dissipate at a rate independent to some degree from their prevalence; reducing current emissions frees up this dissipation capacity, allowing existing harms to fade faster than they otherwise would.

than mitigating any existing 'pollution condition.'"[40] But whether or not the Unit 3 upgrades are required for legal compliance going forward does not affect whether they have the effect of remediating past pollution. Both can be true.[41] As for ILU's arguments that the Unit 3 upgrades were intended to substitute for more rigorous improvements to Units 1 and 2 or to offset those units' future emissions only, the Policy does not cover expenses *intended as* remediation costs; it covers remediation costs. The EPA's and LaGen's intent in negotiating the Unit 3 upgrades, even if it can reliably be ascertained from the evidence ILU cites, does not affect whether the upgrades meet the Policy's definition of that term.

Second, ILU targets LaGen's environmental mitigation projects. The consent decree required LaGen to spend at least $10.5 million on a variety of environmentally beneficial projects in the surrounding region.[42] ILU reiterates its argument, addressed above, that such efforts could only possibly offset future emissions. More fundamentally, however, ILU claims the projects do not offset or mitigate BCII's emissions in any sense, because they operate on environmental harms "with absolutely no demonstrated connection to BCII's emissions." The EPA's apparent belief that the projects do in fact mitigate BCII's emissions (as suggested by the consent decree's labeling them

---

[40] To the extent ILU is arguing that the Unit 3 upgrades are "compliance" measures because they contribute to BCII's compliance with aspects of the Clean Air Act other than this plant-specific permit, its arguments fail. First, it has not been established whether and to what extent LaGen actually violated the Act; to say that the upgrades were required for Clean Air Act compliance begs a question. Second, Unit 3 upgrades cannot bring Units 1 and 2 into compliance with the Act, because the Act imposes unit-specific technology requirements rather than (or in addition to) plant-wide emissions caps.

[41] Again, in its prior Fifth Circuit appeal, LaGen only declined to assert that "remediation" included "costs associated with installation of government mandated equipment and other actions taken *solely* to bring the plant into compliance." *Louisiana Generating L.L.C. v. Illinois Union Ins. Co.*, 719 F.3d 328, 335 (5th Cir. 2013) (emphasis added).

[42] *See supra* note 5 and accompanying text.

"environmental mitigation projects") is, in ILU's view, a "unilateral" position divorced from the project's "substance."

The district court properly rejected this argument. Assuming that "remediation" includes "mitigation," as we do in this section, the projects remediate BCII's emissions. ILU protests that the harms the projects address may exist in the same area as the plant, but cannot be conclusively tied to the emissions from BCII's smokestacks. But those emissions unquestionably contributed to regional pollution and regional environmental consequences in turn, and the proposed projects aim to lessen both.[43] This is a loose connection, but it suffices for "mitigation" as that term is generally understood, both in common parlance and environmental law. For example, under Section 404 of the Clean Water Act and its implementing regulations, developers who fill in wetlands must "mitigate" the damage, and can do so by paying to restore or conserve other nearby wetlands.[44] Obviously, such payments do not remedy the actual damage done; rather, they offset its impact on the broader ecosystem within which that damage occurred. The same is true of these projects.

In sum, ILU failed to raise a genuine issue of material fact as to whether the Consent Decree Measures indirectly mitigate LaGen's past pollution. They do.

---

[43] The mechanism is the same as described above. *See supra* note 39.

[44] *See* 33 U.S.C. § 1344 (2012); 40 C.F.R. § 230.93 (2014). *See generally Compensatory Mitigation*, ENVT'L PROT. AGENCY (May 26, 2016), https://www.epa.gov/cwa-404/compensatory-mitigation. Similar "mitigation" programs address the destruction of endangered species habitat, *see, e.g.*, *Conservation Banking*, U.S. FISH & WILDLIFE SERV. (June 3, 2016), https://www.fws.gov/endangered/landowners/conservation-banking.html ("Conservation banks function to offset adverse impacts to these species that occurred elsewhere, sometimes referred to as off-site mitigation."), and forests, *see, e.g.*, MD. CODE ANN., NAT. RES. § 5-1610.1 (West 2016).

No. 15-30914

V

Third, and finally, ILU argues that LaGen's claimed costs are unreasonable. Under the Policy, "remediation costs" include only "reasonable" expenses. Thus, ILU need not indemnify LaGen to the extent LaGen overspent on the Consent Decree Measures.[45]

ILU's reasonableness arguments mainly concern the Unit 3 SNCR upgrades.[46] The company relies on a report by its expert, Thomas Nunno, which argues that LaGen (1) unnecessarily hired outside contractors; (2) took an unduly long time to complete the upgrades, causing cost overruns; and (3) improperly allocated expenses across BCII's three units.[47] Nunno also observed, and ILU emphasizes on appeal, that (4) another entity, Entergy Corporation, owns 42% of Unit 3 and therefore presumably must pay for part of the upgrades, meaning that some of the costs LaGen claims were not merely "unreasonable" but may not have been incurred by LaGen in the first place.

The district court rejected these points. Generally, it credited LaGen's explanations of the costs. Specifically, it stated that the outside contractors were reasonably necessary, the delays were due to events beyond LaGen's control, the expenses were properly allocated, and LaGen was entitled to repayment in full despite the split in the ownership.

---

[45] Again, although this issue will be moot if the trier of fact determines that indirect mitigation efforts are not "remedial" in the first place, we address it in the interest of judicial economy. *See supra* note 33.

[46] ILU also challenges the reasonableness of LaGen's valuation of surrendered emissions allowances, but we reject its challenge. To value the allowances it surrendered, LaGen multiplied the number of allowances surrendered by the per-allowance market price, as reported by Platts, a well-known industry data provider. Relying solely on a brief expert declaration, ILU urges that LaGen's valuation is flawed in several respects. The declaration is vague and conclusory, and the balance of the record does not illuminate it. Such evidence cannot defeat summary judgment. *See, e.g.*, *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).

[47] LaGen disputes Nunno's credibility, pointing out that he lacked experience with SNCR technology. Maybe so, but given Nunno's extensive relevant industry experience, we find his observations are due at least some weight.

We consider ILU's four points in turn.

### 1. *Use of outside contractors*

Nunno claims that LaGen should not have hired outside contractors because LaGen's staff could have completed the contractors' work themselves. His report cites no evidence for this assertion, and Nunno admitted in a deposition that he had none. Moreover, Nunno did not consider whether it was more cost-effective for LaGen to use contractors rather than its own personnel. Given this, ILU failed to raise a genuine issue of material fact as to the reasonableness' of LaGen's contractor costs.

### 2. *Delay-related cost overruns*

Nunno claims that the Unit 3 upgrades took an unreasonably long time. Citing evidence unearthed during discovery, he argues that LaGen's construction contractor, Bowen Engineering, was guilty of "slow materials delivery and slow performance . . . in the months of December 2013 and January 2014"; that LaGen accordingly instructed Bowen to bring on more help in order to meet its deadlines under the consent decree; and that Bowen charged LaGen millions of dollars for doing so. Nunno further opines that "the project should not have been allowed to fall behind schedule" because LaGen had several staff members and consultants "to maintain track of the project progress and budget."

LaGen's expert, Colin Campbell, retorts that any extra personnel costs were inevitable, due both to the "highly compressed" timeline for completion of the Unit 3 upgrades and the "unavoidable disruptions that occurred during construction." LaGen's contractor William Sargent clarifies that the project was being carried out during the infamous "polar vortex" winter of 2013-14 and that "the discovery of lead paint on the structural steel created a twenty-four day delay . . . as abatement work was completed." It also appears that an

abandoned pipe was discovered during construction and had to be removed, causing further delays.

In his deposition, Nunno, citing weather records and his personal experience in power plant construction, responded that the weather was not so cold so as to preclude work on the upgrades. He also argued that it would have been far more cost-effective for LaGen to pay penalties to the EPA, or to invoke the consent decree's *force majeure* clause, than to bring on more help in order to overcome the delays and meet the deadline.

Given the partially contradictory evidence in the record, and viewing that evidence in the light most favorable to ILU, we find there is a genuine dispute of fact as to whether LaGen's delay-related cost overruns were reasonable. The district court erred in entering summary judgment for LaGen on this issue.

### 3. *Allocation of expenses*

In some cases, LaGen used the same machinery and services to upgrade all three of the plant's units. The parties dispute what portion of the resulting cost should be attributed to Unit 3 as opposed to Units 1 and 2 (for which LaGen is not claiming coverage).

First, LaGen allocated one-third of the cost of plant-wide elevator, power transformer, water treatment, and air compression services to Unit 3. Nunno claims, and LaGen does not appear to dispute, that Unit 3's operation will require more use of the installed air compressors and power transformer than the other units. But as Campbell notes, although Nunno's proposed allocation method is plausible, there are equally logical ways to allocate the cost of these services that would favor LaGen even more than a three-way split. Campbell also observes that there is no applicable industry standard for allocating these costs; indeed, Nunno does not assert that his proposed allocation conforms to

an industry standard or that LaGen's does not. Given this, LaGen's allocation of the power transformer and air compression costs cannot be deemed unreasonable.[48]

As for the elevator, Nunno, citing the deposition of NRG project manager Michael Proffit, claims the Unit 3 work did not require the use of an elevator at all. Campbell, citing Sargent's affidavit, says that elevator service was provided to each unit. LaGen also claims that Proffit lacked firsthand knowledge of the upgrade project and left NRG before it concluded. The underlying evidence here is squarely contradictory, and although Proffit's firsthand knowledge may be disputed, his testimony is considerably more detailed than Sargent's. Given this, a reasonable factfinder could determine that the elevator was not used for Unit 3 (and, in turn, that no portion of its cost could reasonably be attributed to that unit). Thus, summary judgment was improper on this issue.

Finally, as for the water treatment costs, Nunno's report indicates that they should not be attributed to Unit 3, but provides no basis for that assertion. Thus, there is no genuine dispute of material fact on this issue.

Second, Nunno opines that only 30.4% of Bowen's work can be attributed to Unit 3. He reaches this result through an ad-hoc set of calculations based on Bowen's invoices to LaGen. Campbell, LaGen's expert, was "unable to discern from the data provided in [Nunno's] report how this value was calculated" and instead states that a 31.34% allocation is appropriate, as does Sargent. Given the narrow differences between the estimates offered and the inevitable imprecision involved in splitting succinctly documented expenses among

---

[48] In this instance, our reasonableness review is legal in nature because the underlying facts are apparently undisputed. *See Cont'l Sav. Ass'n v. U.S. Fid. & Guar. Co.*, 762 F.2d 1239, 1243 (5th Cir. 1985) ("While generally a question of fact, reasonableness becomes a question of law if the facts are undisputed.").

different units, there is no genuine dispute of material fact as to whether LaGen's experts' estimate is reasonable. Thus, we affirm summary judgment on this issue.[49]

Third, Nunno claims that LaGen evenly allocated engineering design costs across the three units and disputes that allocation, offering evidence that Units 1 and 2 were more complex and required more design work. Campbell and Sargent respond that in fact, the design contractor "provided a break-out of their cost by unit on each invoice" and that coverage for the Unit 3 upgrades should follow that allocation. The data attached to Nunno's report appear to agree: NRG's records attribute less-than-even shares of several of the design contractor's invoices to Unit 3, and those less-than-even shares affect the total amount LaGen claims for the Unit 3 upgrades. However, Nunno asserted in his deposition that NRG's records bundled unrelated expenses into its entries for the relevant invoices, and that the underlying invoices actually indicate an even split of SNCR design expenses across the three units. We discern a genuine dispute of material fact in this complicated back-and-forth. Thus, summary judgment was improper as to whether the design expenses were unreasonably allocated.

*4. Split ownership of Unit 3*

Entergy Corporation owns 42% of Unit 3. ILU asserts, and LaGen does not appear to dispute, that Entergy was therefore "responsible for 42% of [the Unit 3 upgrade] costs." However, LaGen plausibly argues that even if it can eventually recover some of its expenses from Entergy, New York law and the

---

[49] The record suggests that LaGen may previously have sought a 32% allocation of Bowen's work to Unit 3. In its appeal briefing, however, LaGen broadly endorses Sargent's work and does not contest its experts' 31.34% calculation. Thus, we find no genuine dispute of material fact as to whether LaGen is entitled to *that* allocation.

Policy still require ILU to fully indemnify LaGen.[50] The district court ruled for LaGen on this basis. But in its appeal briefing, ILU clarifies that it is not concerned about whether LaGen can eventually obtain repayment from Entergy, but whether LaGen has actually incurred the full cost of the upgrades in the first place, as required for coverage under the Policy.[51]

The evidence ILU cites on this point is inconclusive: it generally acknowledges Entergy's stake in Unit 3, but does not suggest that Entergy actually paid for any of the upgrades or has already reimbursed LaGen. Nevertheless, drawing all reasonable inferences from the undisputed contractual relationship between Entergy and LaGen in ILU's favor, we find that a genuine dispute of material fact exists on this issue.

## VI

Finally, ILU appeals the district court's denial of a continuance. In the lower court, ILU filed motions to compel discovery on various issues, culminating in a motion to defer summary judgment proceedings to accommodate further discovery.[52] The district court denied that ultimate

---

[50] *Cf. Winkelmann v. Excelsior Ins. Co.*, 650 N.E.2d 841 (N.Y. 1995) ("Subrogation is the principle by which an insurer, having paid losses of its insured, is placed in the position of its insured so that it may recover from the third party legally responsible for the loss. . . . An insurer's subrogation rights accrue upon payment of the loss. At that point, an insurer who has paid the policy limits possesses the derivative and limited rights of the insured and may proceed directly against the negligent third party to recoup the amount paid." (citations omitted)).

[51] Under the Policy, remediation costs must be "incurred" by LaGen for ILU's obligation to attach. *Cf. Pfizer, Inc. v. Stryker Corp.*, 385 F. Supp. 2d 380, 386-87 (S.D.N.Y. 2005) ("Although there is little authority on the allocation of covered and non-covered expenses, at least one New York court has held that a party seeking indemnity has the initial burden to establish that an expense was incurred in the defense of a covered claim. Once such proof is introduced, 'the burden of showing that all or a specific portion of it was incurred in defense of a non-covered claim is on the defendant.'" (alterations adopted) (quoting *Health–Chem Corp. v. Nat'l Union Fire Ins. Co.*, 148 Misc.2d 187, 191, 559 N.Y.S.2d 435, 438 (N.Y. Sup. Ct. 1990))).

[52] *See* FED. R. CIV. PROC. 56(d).

motion when it entered summary judgment for LaGen, rendering the preceding motions moot.

Because we vacate summary judgment altogether, ILU's continuance motion is itself moot, and the district court may choose to consider the merit of ILU's underlying discovery motions on remand. We note, however, that many of ILU's requests for additional discovery relate only to arguments which we have deemed unavailing for purposes of summary judgment. In regard to these arguments, having closely reviewed the continuance motion, ILU's briefing, and the relevant portions of the extant record, we find that further discovery would not alter our analysis.[53] Thus, if and when the district court rules on ILU's discovery requests, it need only consider them insofar as they relate to genuine disputes of material fact, as identified in this opinion.

VII

We summarize the results of our necessarily complicated analysis. We uphold the district court's ruling that the Consent Decree Measures indirectly mitigate BCII's past pollution. There is no genuine issue of material fact on this point, nor would further discovery create one. However, it is unclear whether indirect mitigation and abatement efforts qualify in the first place as "remediation," and their costs as "remediation costs," under the Policy. Thus, a genuine dispute of material fact exists as to whether LaGen is entitled to indemnification for *any* of the costs of the Consent Decree Measures.

---

[53] For example, ILU's appeal briefing stresses its purported need for further discovery of settlement communications between LaGen and EPA, arguing that such evidence might demonstrate that the EPA accepted the Unit 3 upgrades and allowance surrenders in exchange for more extensive work on Units 1 and 2. But any such evidence would be legally irrelevant: as explained above, the parties' negotiations over and intent concerning the Consent Decree Measures do not bear on whether those measures in fact remediate BCII's pollution and therefore qualify as remedial under the Policy.

No. 15-30914

Moreover, even if indirect mitigation efforts can give rise to covered "remediation costs," genuine disputes of material fact exist as to whether LaGen's claimed costs are unreasonable. Specifically, it is unclear whether LaGen's claimed costs include costs that Entergy paid; design and elevator costs properly attributable to Units 1 and 2; and unreasonable delay-related cost overruns.

Accordingly, we VACATE summary judgment in its entirety and REMAND for proceedings not inconsistent with this opinion.

27